**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 24 1997**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PAUL E. HOCKETT,

      Plaintiff - Appellee and
      Cross - Appellant,

    v.

SUN COMPANY, INC., (R&M); SUN
COMPANY, INC., RETIREMENT PLAN,

      Defendants - Appellants and
      Cross - Appellees.

Nos. 95-5252
and 95-5255

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 92-C-437-H)**

Steven A. Broussard (Claire V. Eagan and J. Patrick Cremin with him on the briefs), Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, for Defendants-Appellants/Cross-Appellees.

Frederic N. Schneider III (John A. Burkhardt with him on the briefs), Boone, Smith, Davis, Hurst & Dickman, Tulsa, Oklahoma, for Plaintiff-Appellee/Cross-Appellant..

Before **SEYMOUR**, Chief Judge, **ANDERSON**, and **TACHA**, Circuit Judges.

**ANDERSON**, Circuit Judge.

Less than two months after Plaintiff Paul E. Hockett retired from his career with Sun Refining and Marketing Company ("Sun R & M"), Sun R & M's parent corporation, Sun Company, Inc., announced a new early retirement plan that would have benefited him had he delayed his retirement. Hockett sued Defendants Sun Company, Inc., and the Sun Company, Inc, Retirement Plan, alleging breach of fiduciary duty under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1009 et seq., wrongful denial of his request for participation in the new retirement plan, and various state law claims. The district court found the state law claims preempted by ERISA. Following a bench trial on the ERISA claims, the district court, relying upon Maez v. Mountain States Telephone and Telegraph, Inc., 54 F.3d 1488 (10th Cir. 1995), held Defendants liable for a breach of fiduciary duty, finding that Sun Company made material misrepresentations to Hockett regarding the likely availability of a future retirement plan that was already under "serious consideration." The district court rejected, however, Hockett's claim that Defendants wrongfully denied him participation in the new plan. Defendants appeal from the judgment imposing liability for a breach of fiduciary duty, while Hockett cross-appeals from the denial of his participation claim.

We hold that the district court misapplied the concept of "serious consideration." Serious consideration of a future ERISA offering does not occur until (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change. Because Sun Company did not seriously

consider a future offering until after Hockett's retirement, Defendants' alleged misrepresentations cannot constitute a breach of fiduciary duty, and we reverse the portion of the district court order finding such a breach. We affirm in all other respects.

## BACKGROUND

Sun Company produces and markets coal, oil, and natural gas worldwide. During the period most relevant to this appeal, Sun R & M was Sun Company's wholly-owned oil refining and marketing subsidiary, and Sun R & M employees participated in the Sun Company, Inc., Retirement Plan ("SCIRP"), a pension plan subject to ERISA. Sun R & M's operations have since been consolidated back into Sun Company, and Sun R & M exists only as a legal entity. The parties agree that Sun Company is responsible for any of Sun R & M's outstanding liabilities to Hockett.

### A.      Hockett's Retirement from Sun R & M

From 1988 to 1991, the SCIRP granted a 2-1/2% pension enhancement to employees terminated voluntarily or involuntarily. This 2-1/2% enhancement offer was set to expire on July 1, 1991, and Sun Company had publicly announced that the offer would not be extended past that date. As a subsidiary, Sun R & M did not have the authority to amend the SCIRP or offer a different ERISA plan. Only Sun Company's

President or Chief Executive Officer had that authority, subject to approval by Sun Company's Board of Directors.

In 1990, Hockett turned 55, and began considering early retirement. He had worked for Sun R & M (or its predecessors) for approximately twenty-five years, most recently as manager of the Tulsa Credit Card Center. Hockett asked his supervisor, Peter Waitneight, whether he could receive a "package" if he retired early. A "package" referred to the severance pay, bonus pay, and other benefits that Sun R & M had granted in the past, apparently on an ad hoc basis, to some retiring employees. Waitneight told Hockett that a package was unlikely because Sun R & M's President, David Knoll, had established a policy of not granting packages unless the retiree's job position was actually eliminated. Waitneight considered Hockett's position too important to eliminate.

In May, 1991, Waitneight and Hockett had a serious disagreement over whether Hockett was entitled to a merit raise under Sun R & M's new 1991-92 Salary Administration Program. Waitneight told Hockett he did not merit the raise, and Hockett informed Waitneight that if he did not get the raise, he would retire. The impasse ended on June 7, 1991, when Hockett tendered his "official and irrevocable request for early retirement effective July 1, 1991." Appellant's App. at 116. By making the retirement effective July 1, 1991, Hockett qualified for the 2-1/2% SCIRP enhancement on the last possible day.

Even though Hockett had already tendered his irrevocable request for early retirement, he decided to check again whether he could receive a package. On the day Hockett tendered his retirement notice, he asked Waitneight whether he would still be correct in assuming that no package would be offered to him upon his retirement. Waitneight said that was right. Dissatisfied with Waitneight's response, Hockett contacted William Rutherford on June 25, 1991. Rutherford was Sun Company's Vice President of Human Resources and Administration. Hockett explained to Rutherford his decision to retire, and asked Rutherford to help him obtain a package. In response, Rutherford asked Hockett if he wanted to "undo" his retirement. Hockett replied, "No, I don't think . . . [Waitneight] and I could work any more together. What I'm after is the package." Appellant's App. at 122. Rutherford told Hockett he would "check into it and see what he could do," id., but Hockett did not hear back from Rutherford, and his retirement became effective on July 1, 1991.

Despite Hockett's July 1 retirement, Waitneight asked him to continue managing the Credit Card Center under a consulting agreement. Hockett executed a "Professional Services Agreement" with Sun R & M on July 3, 1991, which provided that he would serve as an independent contractor in the Credit Card Center from July 1 to October 31, 1991.

**B.** **The Adoption of the Voluntary Retirement and Termination Program**

In 1990, the Persian Gulf War caused a sharp increase in crude oil prices, the cost of which Sun R & M was not recovering through sales. By May, 1991, Sun R & M executives were examining several cost-cutting measures, and Sun R & M's President, David Knoll, knew that the cost-cutting would have to include a significant labor reduction. On June 18, 1991, Knoll publicly announced the commencement of a company-wide restructuring and downsizing project to be completed by September, 1991. See Appellee's App. Vol. V. at 1599-1602. Knoll's announcement did not explain whether labor reductions would occur through voluntary or involuntary terminations, nor whether there would be any new retirement incentive plans.

In anticipation of the downsizing, Alfred Little, Sun R & M's Director of Human Resources, began studying in May, 1991, the potential benefits of a voluntary termination program. Under a voluntary program, a company offers a mix of retirement/termination benefits designed to induce a targeted number of employees to leave the company voluntarily. Little asked his subordinate, Charles Fuges, to gather information comparing the pros and cons of voluntary versus involuntary termination programs. Fuges contacted Mitchell Anderman, Sun Company's Manager of Employee Benefits Planning and Design, for information regarding voluntary programs, and in a short memorandum dated May 21, 1991, Anderman provided Fuges with a skeletal comparison of the general merits of voluntary versus involuntary termination plans. Id. at 1584-87. Anderman

attached to the memorandum two pages of data regarding what other companies had included in past retirement plans. Id. at 1586-87. Anderman noted in the memorandum that the data had not been updated since 1986. Id. at 1585.

On May 24, 1991, armed with Fuges' information, Little met with David Knoll and Pat Coggins, Sun R & M's Vice President of Administration, to discuss the virtues of a voluntary retirement program. Six days later, Little sent Knoll and Coggins a memorandum stating: "I thought we had a good discussion on Friday, May 24, regarding the question of whether to do a voluntary/involuntary termination package. Fortunately, we do not need to make that decision at this time, but I thought I would give you a few points to consider regarding the advantages of a voluntary." Id. at 1588. The memorandum then listed six general advantages of a voluntary plan.

On June 3, 1991, Fuges sent Little a one page memorandum outlining a potential labor reduction strategy. Id. at 1590. Notably, Fuges states: "Any new pension enhancements/severance package would be developed in response to the business decisions made over the next several months and would be available in the fall/winter." Fuges attached Anderman's May 21 memorandum to his own.

On June 19, 1991, the day after Knoll announced the company-wide restructuring, Knoll announced the formation of a special project team to coordinate the restructuring and downsizing. On July 8, 1991, Nick Neuhausel was appointed Sun Company's Director of Compensation and Benefits Group. His new position pulled together all the

functions involved in the planning, design, implementation and administration of Sun Company benefits. In mid-July, Neuhausel directed Anderman to study and develop an early retirement/termination program consisting of a voluntary plan followed by an involuntary plan. Neuhausel told Anderman that the program needed to induce large numbers of employees to terminate their employment. Anderman contacted actuaries, began cost analysis, and instructed his staff to update information regarding what other comparable companies were offering in the way of early retirement/termination programs.

On about July 26, 1991, Coggins, Neuhausel, Rutherford and Little met to further discuss the early retirement/termination program. They agreed to recommend to Robert Campbell, Sun Company's President, a voluntary termination program followed by an involuntary termination program. On August 7, 1991, Campbell met with Anderman, Rutherford, Neuhausel, Knoll, Coggins and Little. Campbell agreed to recommend the voluntary/involuntary program to Bob McClements, Chief Executive Officer of Sun Company. McClements accepted the recommendation on August 19, 1991.

On or about August 28, 1991, Sun Company announced it would amend the SCIRP to include the new Voluntary Retirement and Termination Program (VRTP). For eligible employees who terminated their employment between September 1 and October 15, 1991, the VRTP enhanced retirement benefits by crediting the employees with (1) an additional three years of age and service, (2) severance payments equal to three weeks of

base pay for every completed year of service, and (3) a bonus. These benefits were superior to the 2-1/2% enhancement Hockett had received.

Rutherford knew by the time he spoke with Hockett on June 25, 1991, that there was going to be a downsizing at Sun R & M, and he knew that Little and others were discussing potential retirement/termination strategies. In fact, Little had discussed with Rutherford his preference for a voluntary plan. It is undisputed that Rutherford did not tell any of this to Hockett.

When Hockett heard the VRTP announcement, he contacted Rutherford and told him he wanted to participate in the Plan. Rutherford inquired with Neil Horgan, Sun Company's Director of Compensation and Benefits, regarding Hockett's eligibility. Horgan determined that Hockett was ineligible because he had retired prior to the VRTP's availability. Hockett left Sun R & M completely when his consulting agreement expired on October 31, 1991.

## C.  Proceedings in the District Court

In the district court, Hockett based his breach of fiduciary duty claim on his June conversations with Waitneight and Rutherford, whom he claims were both plan fiduciaries under ERISA. Hockett argued that both Waitneight and Rutherford knew he was interested in receiving a retirement package that was better than the 2-1/2% enhancement, and that both men knew he felt compelled to retire on July 1, 1991, in order

to receive at least the 2-1/2% enhancement. Most significantly, Hockett contended that when Rutherford told him he would "check into it and see what he could do," he falsely suggested to Hockett that he did not know whether Sun Company was considering a new retirement/termination plan, when Rutherford in fact knew that Sun Company and Sun R & M were already examining a new retirement/termination plan to complement the announced downsizing.

Hockett's alternative claim that Defendants wrongfully denied his request to participate in the VRTP was premised on the fact that he was still working for Sun R & M under the Professional Services Agreement at the time the VRTP became available.[1] Hockett claimed that he was Sun R & M's common-law employee during the period of the Agreement, and that as a common-law employee he qualified for the VRTP.

The district court determined that the breach of fiduciary duty claim was governed by Maez v. Mountain States Telephone and Telegraph, Inc., 54 F.3d 1488 (10th Cir. 1995), in which we held that if an ERISA plan fiduciary communicates with potential plan participants after serious consideration has been given concerning a future offering under the plan, then any material misrepresentations may constitute a breach of fiduciary

---

[1]We style Hockett's wrongful denial of benefits claim as an "alternative" claim because it represents a theory of recovery inconsistent with the breach of fiduciary duty claim. The breach of fiduciary duty claim is premised on the allegation that Hockett's July 1 retirement foreclosed his right to participate in the VRTP. The wrongful denial of benefits claim, by contrast, is premised on the contention that Hockett never lost his eligibility to participate in the VRTP.

duty. The district court found that Rutherford was a fiduciary, but Waitneight was not. Hockett v. Sun Company, Inc. (R & M), No. 92-C-437-H, at 12 (N.D. Okla. Oct. 18, 1995). The court also found that by June 25, 1991, Sun Company and Sun R & M were already seriously considering various alternative retirement/termination plans to be implemented in connection with the anticipated downsizing. Id. at 8. Focusing on the June 25, 1991, conversation between Hockett and Rutherford, the district court found that Rutherford's failure to tell Hockett that Sun was considering a new package when Hockett specifically asked him about the availability of such packages, along with Rutherford's statement that he would "look into" the possibility of a package, falsely suggested that Rutherford did not know whether a package was under consideration and that he would actively undertake to determine whether one was. The district court concluded that this constituted misrepresentations which materially misled Hockett, causing him to retire before implementation of the more beneficial package. Id. at 14-15. The court awarded Hockett stipulated damages compensating for his inability to participate in the VRTP.

With respect to Hockett's wrongful denial of benefits claim, the district court found that when Hockett retired on July 1, 1991, he knew he was giving up his rights to any benefits that might be offered under the SCIRP to active employees. Id. at 9. The district court also found that Hockett was an independent contractor following his retirement, was no longer on the "active payroll" of R & M, and "accordingly was not

-11-

eligible to opt into the VRTP during the 45-day election period in which the VRTP was offered to Sun employees." Id. at 8, 10-11.

**DISCUSSION**

**A.     Breach of Fiduciary Duty**

On appeal, the parties agree that Maez governs Hockett's breach of fiduciary duty claim. Defendants assert, however, that the district court's interpretation of "serious consideration" is inconsistent with ERISA's statutory scheme. Specifically, Defendants argue that at the time Hockett spoke with Rutherford, Sun Company and Sun R & M were engaged only in preliminary research and discussion regarding potential downsizing strategies. Defendants claim that this type of preliminary, internal business deliberation falls within an employer's non-fiduciary, "settlor" function, and does not invoke the rule we announced in Maez. For the following reasons, we agree.

ERISA contemplates that an employer often will act as both employer and plan fiduciary, and not all of an employer's business activities implicate ERISA's fiduciary duties. Varity Corp. v. Howe, 116 S. Ct. 1065, 1071 (1996). In enacting ERISA, Congress did not explicitly enumerate all the duties of an ERISA fiduciary, and did not describe every instance in which an employer acts in a fiduciary capacity, but intentionally left many of these details for the courts to develop in light of the special nature and purpose of employee benefit plans. Id. at 1070. In Maez, we adopted a rule,

-12-

common among the Circuits, to govern when an employer's alleged misrepresentations regarding a *potential* plan change constitute a breach of fiduciary duty. We held that material misrepresentations about a future plan offering do not constitute a breach of fiduciary duty unless the misrepresentations are made after the employer has "seriously considered" the future offering. Maez, 54 F.3d at 1500; accord Muse v. International Bus. Machs. Corp., 103 F.3d 490, 495 (6th Cir. 1996); Fischer v. Philadelphia Elec. Co., 96 F.3d 1533, 1538 (3d Cir. 1996), petition for cert. filed, 65 U.S.L.W. 3468 (U.S. Dec. 24, 1996) (No. 96-1038) ("Fischer II"); Wilson v. Southwestern Bell Tel. Co., 55 F.3d 399, 405 (8th Cir. 1995); Vartanian v. Monsanto Co., 14 F.3d 697, 702 (1st Cir. 1994); Barnes v. Lacy, 927 F.2d 539, 544 (11th Cir. 1991). Maez, however, involved an appeal from a Fed. R. Civ. P. 12(b)(6) dismissal, and our only task there was to determine whether "serious consideration" had been adequately pleaded. Consequently, we did not elaborate upon the meaning of "serious consideration." We recognize that the district court in this case was without the guidance we now provide.

The "serious consideration" requirement is designed to balance "the tension between an employee's right to information and an employer's need to operate on a day-to-day basis." Fischer II, 96 F.3d at 1539. This balancing respects Congress' competing desires, in enacting ERISA, to safeguard employee benefit plans, and yet not make such plans so burdensome or threatening that employers would shy away from offering them. See Varity, 116 S. Ct. at 1070. As a practical matter, an employer's "consideration" of an

ERISA plan can fall anywhere along a continuum, beginning with the most casual mention of a possible plan change and ending, perhaps, with a formal vote by the Board of Directors. Between these two extremes are many stages of research, analysis, and debate, which only some proposals will survive. "*Serious* consideration" marks the point on the continuum at which imposing fiduciary-related duties will best serve the competing congressional purposes.

We believe the proper point on this continuum has already been identified by the Third Circuit in <u>Fischer II</u>. There, the court held that "serious consideration" of a change in plan benefits does not exist until (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change. 96 F.3d at 1539. Until these three factors intersect, misrepresentations regarding future plan changes cannot be material, and thus cannot constitute a breach of fiduciary duty. <u>Id.</u> at 1538 ("Serious consideration forms the crux of the [materiality] inquiry.").

In our view, the <u>Fischer II</u> formulation appropriately narrows the range of instances in which an employer must disclose, in response to employees' inquiries, its tentative intentions regarding an ERISA plan. Employers frequently review retirement and benefit plans as part of ongoing efforts to succeed in a competitive and volatile marketplace. If *any* discussion by management regarding possible change to an ERISA plan triggered disclosure duties, the employer could be burdened with providing a

constant, ever-changing stream of information to inquisitive plan participants.  See id. at 1539 ("A corporation could not function if ERISA required complete disclosure of every facet of these on-going activities."); Pocchia v. Nynex Corp., 81 F.3d 275, 278 (2d Cir.) (ERISA does not require that a fiduciary disclose its internal deliberations), cert. denied, 117 S. Ct. 302 (1996).  And, most of such information actually would be useless, if not misleading, to employees, considering that many corporate ideas and strategies never reach maturity, or else metamorphose so dramatically along the way, that early disclosure would be of little value.  See Fischer II, 96 F.3d at 1539 (noting that precipitous disclosure requirements could lead to "an avalanche of [employer] notices and disclosures" that would actually impair an employee's ability to make a sound decision regarding retirement); Muse, 103 F.3d at 494; Pocchia, 81 F.3d at 278.  Furthermore, requiring employers to reveal too soon their internal deliberations to inquiring beneficiaries could seriously "impair the achievement of legitimate business goals" by allowing competitors to know that the employer is considering a labor reduction, a site-change, a merger, or some other strategic move.  Muse, 103 F.3d at 494 ("[I]f IBM had been forced to disclose prematurely the fact that it was studying the closing or selling of the Lexington site, which manufactured most of IBM's typewriters, the information could have been used by competitors to damage IBM seriously.").

Even more importantly, we believe the Fischer II standard protects employees' access to material information without discouraging employers from improving their

-15-

ERISA plans in the first place. As recognized by the Sixth Circuit, "[c]hanging circumstances, such as the need to reduce labor costs, might require an employer to sweeten its severance package, and an employer should not be forever deterred from giving its employees a better deal merely because it did not clearly indicate to a previous employee that a better deal might one day be proposed." Swinney v. General Motors Corp., 46 F.3d 512, 520 (6th Cir. 1995). Moreover, employers often decide to "sweeten" an early retirement plan only after the employer has determined that not enough employees are opting to retire under the existing one. "If fiduciaries were required to disclose such a business strategy, it would necessarily fail. Employees simply would not leave if they were informed that improved benefits were planned if workforce reductions were insufficient." Pocchia, 81 F.3d at 279. Thus, precipitous liability could push employers in the direction of involuntary lay-offs, a common alternative to early retirement inducements. The Fischer II standard minimizes this possibility.

Before applying the proper definition of "serious consideration" to the facts in this case, we briefly elaborate on the definition's three elements. As explained by the Third Circuit, the first element, a specific proposal, "distinguishes serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options." Fischer II, 96 F.3d at 1539-40. Although the specific proposal need not be in final form, it must be "sufficiently concrete to support consideration by senior management for the purposes of implementation." Id. at 1540. The second element,

discussion for purposes of implementation, while further distinguishing serious

consideration from the preliminary steps of gathering data and formulating strategy, also

ensures that senior management can participate in the preliminary steps without

"automatically triggering a duty of disclosure." Id.

> [A] corporate executive can order an analysis of benefits alternatives or commission a comparative study without seriously considering implementing a change in benefits. Preliminary stages may also require interaction among upper level management, company personnel, and outside consultants. These discussions are properly assigned to the preliminary stages of company deliberations. Consideration becomes serious when the subject turns to the practicalities of implementation.

Id.

The third element, consideration by senior management with the authority to

implement the change, requires courts to focus on the "proper actors within the corporate

hierarchy." Id. Middle and upper-level management employees frequently investigate

trouble spots and recommend change to their supervisors. This alone is not serious

consideration. "These activities are merely the ordinary duties of the employees. Until

senior management addresses the issue, the company has not yet seriously considered a

change." Id. For purposes of this rule, senior management consists of those with

responsibility over company benefits who ultimately will make recommendations to the

Board. Id.

Applying these elements to this case, we conclude that Sun Company[2] did not seriously consider a future ERISA offering until sometime after July 1, 1991.[3] In examining the record, we find no intersection of the three Fischer II factors until late July or early August, 1991. For example, it was on August 7, 1991, that Campbell, Knoll, Anderman, Rutherford, Neuhausel, Coggins and Little all met to discuss a specific voluntary termination proposal, and Campbell agreed to recommend the proposal to Sun Company's CEO. This meeting gathered together the heads of all departments related to employee benefits, as well as the presidents of Sun R & M and Sun Company. While Sun Company's CEO made the ultimate decision regarding the VRTP, the August 7 meeting demonstrates the type of consideration envisioned by the Fischer II standard. While we do not decide the precise date upon which serious consideration began in this case, we note that nothing similar to the August 7 meeting occurred prior to July 1, the date on which Hockett voluntarily terminated his employment with Sun R & M.

In arguing that serious consideration occurred prior to his June 25 conversation with Rutherford, Hockett relies primarily on (1) the Little, Anderman, and Fuges memoranda, (2) the May 24 meeting between Little, Knoll, and Coggins, and (3) the fact

---

[2]Although we refer to Sun Company, we have considered all the activities of both Sun Company and Sun R & M in determining when serious consideration began.

[3]The question of when "serious consideration" began is a mixed question of law and fact. In reaching our determination in this case, we have not questioned the district court's factual findings, but instead reverse based on the application of the appropriate legal standard to those findings.

that Sun R & M had already publicly announced, on June 18, that a future downsizing was planned, suggesting that company officials knew, at least by that time, that a change in the retirement plan would be needed to accommodate the downsizing. Even assuming that Sun Company's senior management was relatively certain, prior to June 25, that an early retirement plan would have to be offered soon, this does not mean that Sun Company was yet seriously considering a plan. The May-June memoranda and meetings do not support an inference that any specific proposal was being considered, at that time, for purposes of implementation by senior management with the authority to implement the change. Instead, the May and June activities are prime examples of preliminary exploration and evaluation. Little's May 24 memorandum provides the most general comparison of voluntary and involuntary plans, and Fuges' June 3 memorandum, far from outlining a "sufficiently concrete" proposal, explicitly notes that "any new pension enhancement/severance package would be developed in response to the business decisions made over the next several months." Notably, there is no evidence that any fresh cost-analysis or actuarial work occurred until July. While cost-analysis or actuarial work is not a necessary prerequisite to serious consideration, it is unlikely that a specific proposal would be "sufficiently concrete" without some such information. See Fischer II, 96 F.3d at 1542 ("Serious consideration can only begin after information is gathered and options developed.").

The parties dispute whether Little and Fuges were developing strategies at the direction of senior management or as part of their self-initiated campaign to convince senior management that a voluntary retirement plan was the best option. Ultimately, this is unimportant. As previously mentioned, senior management may commission, and even participate in, preliminary discussions or comparative studies without "automatically triggering a duty of disclosure." Fischer II, 96 F.3d at 1540. Before Sun Company's senior management could turn its attention to the practicalities of implementation, a specific and developed proposal was needed. This was not available until after Hockett's retirement.

Because serious consideration did not occur until after July 1, neither Rutherford's nor Waitneight's prior statements regarding the availability of a package could have constituted a breach of fiduciary duty, and we reverse the portion of the district court order finding such a breach.[4]

---

[4]Having decided that serious consideration did not occur until after Hockett's conversations with Rutherford and Waitneight, we need not decide whether these men actually qualified as fiduciaries under ERISA. And, since Hockett retired prior to serious consideration, we do not address the open question of whether serious consideration imposes upon plan fiduciaries a general duty to disclose. In Maez, we held only that *affirmative* misrepresentations could constitute a breach of fiduciary duty--we expressly did not decide whether a duty to disclose exists. 54 F.3d at 1501 n.6. Again, we reserve that question. But see Muse, 103 F.3d at 494 ("Until a plan is adopted, there is no plan, only the possibility of one. A fiduciary is therefore generally not required to disclose changes in a benefit plan before it is adopted."); Pocchia, 81 F.3d at 278-79 (adopting a bright-line rule that fiduciaries need not voluntarily disclose changes in a benefit plan until they are adopted).

**B.      Wrongful Denial of Plan Benefits**

Having reversed the district court's judgment on the breach of fiduciary duty claim, we must determine whether the district court properly rejected Hockett's claim that Defendants wrongfully denied his request to participate in the VRTP.[5]  On cross-appeal, Hockett's argument essentially follows a three-step path:  (1) the VRTP was available to "employees" who elected to terminate their employment between September 1 and October 15, 1991; (2) the SCIRP defines "employee" in the same way as the common-law; and (3) Hockett was Sun R & M's common-law employee from July 1 to October 31, 1991 (the period of the Professional Services Agreement).  From these three premises, Hockett concludes that he was eligible for the VRTP.  We disagree.

We are doubtful that the VRTP, via the SCIRP, defines "employee" in a manner identical to the common law, but we need not address that point.  The district court found that Hockett was an independent contractor, not an employee, during the term of the Professional Services Agreement.  The determination of whether an individual is an employee for purposes of ERISA is a question of fact, reviewable under the clearly erroneous standard.  Roth v. American Hosp. Supply Corp., 965 F.2d 862, 865 (10th Cir. 1992).  A finding is clearly erroneous only if it is without factual support in the record, or if, in light of the entire record, the reviewing court is left with a definite and firm

---

[5]Defendants have filed an unchallenged motion to file a supplemental appendix with their cross-appellee's brief.  We grant the motion.

conviction that a mistake has been made.  Cowles v. Dow Keith Oil & Gas, Inc., 752 F.2d 508, 511 (10th Cir. 1985).  Under this standard, we uphold "any district court determination that falls within a broad range of permissible conclusions."  Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 400 (1990).[6]

In determining whether a hired party is an employee under the general common law of agency, courts evaluate all factors relevant to the hiring party's right to control the manner and means by which the product is accomplished.  Roth, 965 F.2d at 866.  These factors include:

(a) the skill required in the particular occupation;

(b) the source of the instrumentalities and tools for the person doing the work;

(c) the location of the work;

(d) the duration of the work relationship;

(e) the hiring party's right to assign additional projects to the hired  party;

---

[6]Typically, we would review a plan administrator's decision regarding eligibility under either the arbitrary and capricious or de novo standard, depending upon whether the plan gives the plan administrator discretion in making such determinations.  See Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan, 102 F.3d 1435, 1437 (7th Cir. 1996).  The parties sharply dispute, however, whether Neil Horgan was the plan administrator, and whether Horgan ever made any real determination regarding Hockett's eligibility.  The district court made findings of fact and law independent of Horgan's determination.  We have reviewed those findings without deference to any determination Horgan made.  Even under this standard of review, which is most favorable to Hockett, we affirm the district court.

(f) the hired party's discretion over when and how long to work;

(g) the method of payment, whether by the time or by the job;

(h) the hired party's role in hiring and paying assistants;

(I) whether the work is a part of the regular business of the hiring party;

(j) whether the hiring party is or is not in business;

(k) the provision of employee benefits;

(l) the tax treatment of the hired party.

Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992). "A court may also consider the intent of the parties and their beliefs as to whether they have created the relation of employer and employee. Roth, 965 F.2d at 866. No single factor is dispositive. Darden, 503 U.S. at 324.

The district court's determination was not clearly erroneous. At trial, Hockett repeatedly testified that he intentionally terminated his employment with Sun R & M by retiring on July 1, 1991. The Professional Services Agreement Hockett subsequently executed explicitly provided that he was an independent contractor, not Sun R & M's employee. Hockett understood the consulting arrangement would last for only a short duration. Following July 1, Sun R & M did not withhold taxes from Hockett's income , and Hockett actually drew retirement benefits, an act generally inconsistent with continuing employment. Although the Professional Services Agreement granted Sun R & M the right to make "changes, additions and/or deletions" to Hockett's work, such

-23-

changes had to be acceptable to Hockett. Appellee's App. Vol. V. at 1786. Furthermore, the management work Hockett performed was the type of skilled work suitable to a consulting arrangement. These factors support the district court's finding that Hockett was not Sun R & M's employee following July 1, 1991.

Admittedly, other factors cut in favor of Hockett. Sun R & M provided Hockett's work space, and paid Hockett by the hour. The work he performed was part of Sun R & M's regular business. The district court could fairly conclude, however, that these factors were of less importance in light of Hockett's deliberate decision to change his status at Sun R & M. See Roth, 965 F.2d at 867 (noting that an individual's "deliberate and calculated choice" to not be an employee can reduce the relevance of many Darden factors). In short, the district court decision was within "the range of permissible conclusions," and we will not upset it on appeal. Because Hockett was not Sun R & M's common-law employee during the availability of the VRTP, his argument fails by its own terms.


## CONCLUSION

We GRANT Defendants' motion to file a supplemental appendix. We REVERSE the portion of the district court order finding Defendants liable for a breach of fiduciary duty. We AFFIRM the denial of Hockett's claim for participation in the VRTP.