**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 17 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

CAPITAL CITIES/ABC, INC.; KANSAS CITY
STAR COMPANY; THE CAPITAL CITIES
PUBLISHING PENSION PLAN; RONALD J.
DOERFLER, DAVID J. VONDRAK, WARREN
SALERNO, in their capacity as Administrative
Committee of the Capital Cities Publishing Pension
Plan, and as Employee Benefits Committee of The
Capital Cities/ABC, Inc. Savings & Investment Plan;
THE CAPITAL CITIES/ABC, INC. SAVINGS &
INVESTMENT PLAN; THE KANSAS CITY STAR
COMPANY GROUP INSURANCE PLAN; ROBERT
C. WOODWORTH, WESLEY R. TURNER, JAMES
L. PAYNE, DELL CAMPBELL, ARTHUR S.
BRISBANE, RALPH W. ROWE, R. RICHARD
HOOD, CLARK M. LAMBERT, H. KENT
SIMOCOSKY, PEGGY GINTHER RUSH, in their
capacity as the Kansas City Star Company's Benefits
Committee; THE KANSAS CITY STAR SPENDING
ACCOUNT PROGRAM;

      Plaintiffs - Appellees,

    v.

ROCKIE RATCLIFF, ERNIE ARNOTE, and PAUL
WOOTEN,

      Defendants - Appellants,

No. 97-3031

CONSOLIDATED WITH:

ROBERT G. HUTSELL, DAVID E. NEWMAN, GORDON S. WRIGHT, GILBERT L. MITCHELL, BRADLEY L. MCELHANEY, MICHAEL K. SHEPHERD, MICHAEL SHUMACHER, JANET IRWIN, CATO SIMS, JR., RONALD D. WRIGHT, TERESA A. TODD, ROGER GATSCHET, KEVIN B. CLARK, PAUL VINCENT, ROCKIE RATCLIFF, LINDA INGLEHART, RALPH SMITH, RUTH V. CORNETT, HARVEY A. STEPHENS, DAVID KIRKPATRICK, JOHN C. FOX, ERNIE ARNOTE, PAT CASKEY, ROGER W. DEAN, TOM HOOVER, DONALD MIESNER, TOM PALMER, MICHAEL PIEDMONTE, CRAIG A. ROBINSON, PAUL TRULL, PAUL WOOTEN,

      Plaintiffs - Appellants,

  v.

THE KANSAS CITY STAR COMPANY; CAPITAL CITIES MEDIA, INC.; CAPITAL CITIES/ABC, INC.; CAPITAL CITIES PUBLISHING PENSION PLAN; CAPITAL CITIES/ABC, INC. SAVINGS AND INVESTMENT PLAN; THE KANSAS CITY STAR COMPANY EMPLOYEE GROUP INSURANCE PLAN, and THE KANSAS CITY STAR COMPANY SPENDING ACCOUNT PROGRAM,

      Defendants - Appellees.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS (D.C. NOS. 94-CV-2488 and 95-CV-2212)**

Robert J. Bjerg, Seigfreid, Bingham, Levy, Selzer & Gee, P.C., Kansas City, Missouri (Rachel H. Baker, Seigfreid, Bingham, Levy, Selzer & Gee, P.C., Kansas City, Missouri; R. Frederick Walters and J. Brett Milbourn, Walters, Bender & Strohbehn, P.C., Kansas City, Missouri, with him on the briefs) for Appellants.

Michael S. Horne, Covington & Burling, Washington, D.C. (Joseph R. Colantuono, Overland Park, Kansas; Jeffrey B. Coopersmith, Covington & Burling, Washington, D.C., with him on the brief) for Appellees.

Before **ANDERSON**, **BALDOCK**, and **MURPHY**, Circuit Judges.

**ANDERSON**, Circuit Judge.

These consolidated appeals arise under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), and involve two groups of parties: those collectively known as "the Star" (Capital Cities/ABC, Inc., The Kansas City Star Company, the Star's four ERISA Plans and the ERISA Plans' claims committees, which had filed a declaratory judgment action against three newspaper carriers/delivery agents for the newspaper, the *Kansas City Star*); and those collectively known as "the Carriers" (thirty-one *Kansas City Star* newspaper carriers/delivery agents, representing a class of such carriers, who had filed an action against the Star). The Carriers' action was transferred to the District of Kansas, where it was consolidated with the Star's declaratory judgment action. The district court granted summary judgment to the Star. At issue is

whether the Carriers are eligible to receive benefits under the Star's four ERISA plans. We affirm the district court's conclusion that they are not.[1]

## BACKGROUND

Certain basic facts are undisputed. The Kansas City Star Company publishes the *Kansas City Star* newspaper. Until March 1990, it also published the *Kansas City Times*. The Star is a wholly-owned subsidiary of Capital Cities/ABC, Inc. The Carriers represent a class certified by the district court and consisting of "[a]ll persons who have been home delivery or single copy agents for the Kansas City Star Company pursuant to agency agreement since the delivery agent system was implemented by The Star in or about 1978." Capital Cities/ABC, Inc. v. Ratcliff, 953 F. Supp. 1228, 1230-31 (D. Kan. 1997).

The Star offers to certain of its employees four separate ERISA plans: two employee pension plans and two employee welfare benefit plans. The pension plans are the Capital Cities/ABC, Inc. Savings & Investment Plan (the "Savings Plan") and the Capital Cities Publishing Pension Plan (the "Pension Plan"). The employee welfare benefit plans are the Kansas City Star Company Group Insurance Plan (the "Group Insurance Plan") and the Kansas City Star Spending

---

[1]The Carriers have filed a motion for leave to file a supplemental joint appendix, which we grant.

Account Program (the "Spending Account Program"). A single committee comprised of Capital Cities officers and directors serves as the administrator of both the Savings Plan and the Pension Plan. A single committee comprised of Star officers and directors administers the coverage of the Group Insurance Plans and the Spending Account Program.

From 1880 until 1977, the Star's newspapers were delivered by independent newspaper carriers who bought papers from the Star at a wholesale rate and then resold them at a retail rate to customers. There is no dispute that those carriers were independent contractors with complete control over the delivery of papers. In September 1977, shortly after Capital Cities acquired the Star, the Star notified its carriers that it planned to change its newspaper delivery system. It terminated all existing contracts with its carriers, and replaced them with "Agency Agreements" pursuant to which the carriers became delivery agents. These Agency Agreements, which are critical to this case, provide in pertinent part as follows:

> The Agent is and will continue to be a self-employed independent contractor and not an employee or servant of The Star. . . .
>
> It is expressly understood and agreed between the parties that The Agent will not be treated by The Star as an employee for federal, state, or local tax purposes . . . .
>
> It is further expressly understood that, as an independent contractor, The Agent will not receive, and has no claim to, any benefits or other compensation currently paid by The Star to its

-5-

employees or hereafter declared by The Star for the benefit of its employees. The Agent's compensation under this Agreement shall consist, in its entirety, of the fees set forth in paragraph 8 below.

Appellants' J.A. Vol. 1 at 135-37. Paragraph 8 in turn provided for a series of fees to be paid by the Star to the delivery agent, including a delivery fee for each newspaper delivered, a delivery service incentive fee, a collection incentive fee, and a solicitation incentive fee.

In 1991, the Internal Revenue Service began examining the Star's delivery agent system, and a subsequent audit resulted in the IRS's issuance of a Technical Advice Memorandum which concluded that many of the Carriers were common law employees of the Star.[2] A group of the Carriers then formally requested ERISA benefits under the Star's four ERISA plans. The Plans' claims committees eventually issued decisions denying the Carriers' claims for benefits under the four Plans.

The Star then filed its declaratory judgment action against three of the Carriers and the class they represent, seeking the following declaratory relief: that the Carriers were bound by their Agency Agreements which stated they would receive no benefits under the Plans; that the Carriers were not employees under the Plans; that the Carriers were estopped from pursuing claims for benefits; and that the decisions of the claims committees denying benefits should be upheld.

_____

[2]This determination has, apparently, been retracted by the IRS.

-6-

The Carriers followed with their own class action suit, which was consolidated with the Star's action for declaratory relief.

The Star filed a motion for partial summary judgment, arguing that the Carriers were not eligible for benefits under the terms of the Plans and that the Carriers were bound by their Agency Agreements which provided that they were independent contractors and would not be entitled to any employee benefits. The Carriers also filed a motion for partial summary judgment, arguing that they were common law employees of the Star. The court granted the Star's motion for summary judgment and this appeal followed.

## DISCUSSION

We review de novo the judgment of the district court granting summary judgment, applying the same standard as did the district court. Chiles v. Ceridian Corp., 95 F.3d 1505, 1510 (10th Cir. 1996). Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We, as usual, construe the facts and all reasonable inferences therefrom in the light most favorable to the part opposing summary judgment. Chiles, 95 F.3d at 1510.

A court must review the decision denying benefits under an ERISA plan de novo "unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan."

Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); see also

McGraw v. The Prudential Ins. Co., No. 97-6064, 1998 WL 96849, at *5 (10th

Cir. Mar. 6, 1998). Finding no language in the Plans conferring discretionary

authority on the administrators to determine entitlement to benefits, the district

court applied a de novo standard. The parties agree that the same de novo

standard applies on appeal.

The district court held that the Plans' committees correctly denied benefits

to the Carriers on two bases: the Agency Agreements foreclosed their right to

benefits and the terms of the four Plans evinced an intent to exclude the Carriers.

We agree with the district court on both grounds.


## I. Agency Agreements

Relying on Boren v. Southwestern Bell Tel. Co., 933 F.2d 891 (10th Cir.

1991), the district court held that:

> [T]he Carriers contractually agreed prior to commencing employment
> with The Star that they would not be entitled to benefits. The
> Agency Agreements define the relationship of the parties. The
> Carriers are not entitled to benefits because the promise of benefits
> was a unilateral offer which they expressly rejected under the terms
> of the Agency Agreements. The court concludes that the Plan
> Committees properly denied benefits to the Carriers on the basis that
> the Carriers had signed Agency Agreements foreclosing their right to
> benefits.

Capital Cities, 953 F. Supp. at 1235 (footnote omitted). The Carriers argue the district court erred because (1) Boren has been implicitly overruled by Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318 (1992); and (2) even if Boren remains good law, summary judgment was improper because there are numerous disputed factual issues relating to the validity and enforceability of the Agreements. We reject these arguments.

In Boren, the plaintiff entered into a series of contracts with Southwestern Bell, each of which designated him as an independent contractor "for any purpose." We observed that "[u]nder the common law, the promise of a pension is a unilateral offer which an employee accepts by performing the work governed by his employment contract." Boren, 933 F.2d at 894. We rejected the plaintiff's claim to pension benefits, stating:

> [T]he express terms of Mr. Boren's service contracts, in which he agreed that he was not considered an employee "for any purpose," prevent him from claiming that the work he performed for Southwestern Bell constituted an acceptance of the company's unilateral offer of pension benefits. Clearly, neither party intended Mr. Boren's work to constitute such an acceptance.

Id. We thus held that "the service contracts define the relationship of Mr. Boren and Southwestern Bell and determine their rights inter se." Id. Boren has not been overruled, either implicitly or explicitly, by Darden.

In Darden, the Supreme Court simply held that, since Congress had failed to provide a satisfactory or helpful definition of "employee" in ERISA, where

there was ambiguity about whether someone seeking benefits was an employee or not, the common law definition would apply. The opinion does not say that any person meeting the common law definition of employee is entitled to ERISA benefits. Thus, it by no means indicates that the Carriers, should they prove they meet the test for common law employees, would automatically be entitled to participate in the Plans. Indeed, it is well established that employers may exclude categories of employees from their ERISA plans. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 91 (1983); Bronk v. Mountain States Tel. & Tel., Inc., ___ F.3d ___ (10th Cir. 1998). Employers need not include every employee who meets the common law definition of employee. See Hockett v. Sun Co., 109 F.3d 1515, 1525-27 (10th Cir. 1997).[3]

---

[3]We agree with the Star that our decision in Roth v. American Hosp. Supply Corp., 965 F.2d 862 (10th Cir. 1992), did not treat Boren as overruled by Darden. In Roth, the question was whether Mr. Roth was entitled to benefits under one company's plan when he had contractually agreed to be treated solely as an employee of another company. We examined the Darden common law employee factors to determine whether he had standing under ERISA as an employee of the company from whom he sought benefits. We concluded that he did not and we recognized the validity of his contract specifically "waiv[ing] his right to [the company's] benefit plans by refusing to become its employee." Id. at 867.

Similarly, our decision in Hockett v. Sun Co., 109 F.3d 1515 (10th Cir. 1997), is not inconsistent with Boren or our decision in this case. In Hockett, a former employee signed a professional services agreement with his former employer, in which the former employee was designated as an independent contractor. We applied the Darden factors to determine whether he was in fact an employee or an independent contractor, and concluded he was an independent contractor. The agreement in Hockett did not,

(continued...)

-10-

Furthermore, Boren remains the law in this circuit, and, under Boren, contracts like the Agency Agreements may "define the relationship of [the Carriers] and [the Star] and determine their rights inter se." Boren, 933 F.2d at 894. Under the Agency Agreements, the Carriers and the Star mutually agreed that the Carriers would not be treated as employees, would not receive "any benefits or other compensation currently paid by The Star to its employees or hereafter declared by The Star for the benefit of its employees," Appellants' J.A. Vol. 1 at 136-37, and would receive as compensation only the fees set forth in the Agreements. Thus, it is clear under the Agreements—bilateral contracts entered into at the commencement of the working relationship—that the Carriers were not entitled to benefits under the Star's ERISA plans.

The Carriers argue further, however, that, even if the Agency Agreements would otherwise foreclose the Carriers' argument that they are entitled to benefits, summary judgment was improper because they have presented evidence of material disputed facts as to the voluntariness of the Agreements. In particular, the Carriers submitted 38 affidavits which they argue show a factual dispute over whether the Carriers were coerced by the Star into signing the

---

[3](...continued)
however, contain the statement that is critical to this case—namely, the explicit agreement not to receive benefits.

-11-

Agreements and whether the Agreements were the product of honest arms-length bargaining. We reject this argument for two reasons.

First, we agree with the district court and the Star that there is no issue here of the waiver of an existing right to receive benefits. Because the Agency Agreements were signed prior to the commencement of the Carriers' work, they were simply executory contracts containing an agreement that, inter alia, the Carriers would receive no benefits. Thus, the question of the voluntariness of a waiver of existing rights is irrelevant.

Second, assuming the Carriers have a valid argument on whether they were coerced into signing the Agreements, they have not established the existence of a disputed issue of material fact. The affidavits in question assert that the Agreements were presented to the Carriers on a "take-it-or-leave-it" basis, that the Carriers had no opportunity or ability to negotiate the terms of the Agreements, and that they were given little time to review the Agreements before signing them. Taking all of that as true, we are not convinced that there is a disputed issue of fact *material* to this case.

The relevant issue, under Boren, is whether the Agreements constitute a mutual understanding that the Carriers would not receive benefits under the Star's Plans. The Carriers had, for many years, been independent contractors who unquestionably had no claim to eligibility for benefits. Thus, the Agreements

-12-

represented no change from the Carriers' prior status. The Agreements, which the Carriers signed each year, apparently without complaint, perpetuated that relationship, and there is no indication that the Carriers were unaware of their status vis-a-vis the Star's Plans. The Carriers present no evidence that they attempted to change or challenge the Agreements in that respect, or that they ever expressed dissatisfaction with their compensation package, including their non-participation in the Plans. And the fact of the matter is, while the Carriers complain that the Agreements were presented to them on a "take-it-or-leave-it" basis, they were free to not "take it" and the Star could hire people who would.

In sum, while the Carriers' affidavits contain many statements suggesting that the Star did not in fact treat them as independent contractors, that is actually irrelevant to the narrow question at issue in this case—namely, whether the Carriers voluntarily agreed that they would receive no benefits under the Plans. General statements that they were not offered the chance to negotiate the terms of the Agreements, or even that they were given little time to review them, do not convince us that there is a genuine factual dispute about whether the Carriers were aware of or agreed to the continuation of the identical status they had for many years previously as non-participants in any employee benefits plans

maintained by the Star.[4] We therefore affirm the district court's conclusion that summary judgment was properly granted to the Star on the ground that the Agency Agreements foreclosed the Carriers' right to benefits.

## II. The Terms of the Plans

While our conclusion that the Agency Agreements foreclose the Carriers' assertion of entitlement to benefits and fully support the district court's grant of summary judgment to the Star, we alternatively affirm the district court's conclusion that the terms of the Plans exclude the Carriers. As all parties agree, the Supreme Court has directed us to interpret an ERISA plan like any contract, by examining its language and determining the intent of the parties to the contract. See Firestone Tire & Rubber Co., 489 U.S. at 112-13; Chiles v. Ceridian Corp., 95 F.3d 1505, 1511 (10th Cir. 1996). If we determine that the plan language is ambiguous, we may look at extrinsic evidence. We note,

---

[4]The Carriers also argue that the Star committed fraud in connection with the Agency Agreements because it kept secret from the Carriers the fact that the IRS had sent a notice to the Star indicating that it believed one of the Delivery Agents was a common law employee for federal income tax purposes. One of the pieces of evidence upon which the Carriers rely to support this argument is a confidential memorandum addressed to "ALL CIRCULATION DIVISION PERSONNEL." Appellants' J.A. Vol. 2 at 574. In this memorandum, however, it is clear that the Carriers were aware of the IRS' inquiries, and it contains the statement that "[s]ome [of the Carriers] feel that they have been found to be employees." Id. Thus, it hardly seems that the Carriers were unaware of the IRS' concerns about their status.

however, that if the extrinsic evidence to which we resort is conflicting, summary judgment is inappropriate. Id. at 1515. There are four Plans involved in this case. We address each in turn.

The Savings Plan includes "any staff or talent employee of the Company who is remunerated in U.S. currency, but shall not include . . . an individual who is hired by the Company pursuant to an employment agreement or personal services agreement if such agreement provides that such individual shall not be eligible to participate in the Plan." Appellants' J.A. Vol. 1 at 174-75. The district court did not specifically state whether it viewed the Agency Agreements as employment agreements or personal services agreements, but nonetheless held that they qualified as agreements excluding the Carriers from participation. The Star argues they are personal services agreements, an argument which the Carriers forcefully reject, and the parties spar on the issue of whether they are "employment agreements" under the Plan. The Carriers argue that such an interpretation concedes the Star's whole case—if we hold they are employment agreements, we have conceded that the Carriers are employees and therefore eligible to participate in the Plan. The Star responds that that is not necessarily so; even if the Carriers are "employees" that does not automatically mean they are Plan participants, since ERISA plans may permissibly exclude certain employees.

Like the district court, we decline to determine which precise type of agreement the Agency Agreements were because we conclude, from the language of the Savings Plan, that the clear intent of the Plan was to exclude from participation those with whom the Star had contractually agreed not to provide benefits. The Agency Agreements contain just that agreement. Thus, we affirm the district court's conclusion that the Savings Plan clearly excluded the Carriers, as parties with whom the Star had entered into agreements specifically stating they would not be eligible to participate in the Plan.

The Pension Plan defines a "participant" as "an Employee who is eligible to be and becomes a Participant in accordance with the provisions of Section 2.1." Appellants' J.A. Vol.1 at 188. Section 2.1 in turn defines eligibility by reference to an individual's "Employment Commencement Date," which is defined as "the first day for which an individual is credited with an Hour of Service." Id. at 186, 189. As the Star argues, nothing involving the Carriers' relationship with the Star, whether compensation or work duties, contemplates "hours of service." While we agree with the Carriers that, standing alone, the definition of employee as "any individual . . . . in the service of [the Star]," is quite broad, when the

Pension Plan is construed as a whole, it is clear that it did not contemplate individuals like the Carriers when it defined and described its participants.[5]

The remaining two Plans, the Insurance Plan and Spending Account Program, provide little specific guidance as to who is eligible to participate, other than general statements about "eligible employees." The use of the term "eligible" suggests that some sub-group of all employees would be participants; it therefore connotes some criteria for determining eligibility. Thus, as the Star argues, those two Plans cannot include "all common law employees" because the term "eligible" would thereby be superfluous. Additionally, under both Plans, payments for participation in the Plan are deducted from the participant's payroll check, and the Carriers do not dispute the Star's statement that the Carriers have never been on the Star's payroll.

Finally, in examining the language and intent of all four Plans, we cannot ignore the fact that the Carriers had signed the Agreements, which specifically provided that they would receive no benefits. It defies common sense to think

---

[5]The Carriers argue that the Star's argument concerning the "employment commencement date" is not properly before us because "it was not part of the basis for the claims committees' denial of benefits decisions nor was it relied upon by the district court in its decision granting summary judgment." Appellants' Reply Br. at 17 n.2. We reject this argument. We have stated many times that "[w]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." Medina v. City & County of Denver, 960 F.2d 1493, 1495 n.1 (10th Cir. 1992) (citations omitted).

-17-

that the Star would simultaneously enter into explicit agreements, signed anew each year or at least every two years, *excluding* the Carriers from participation in the Plans, while maintaining and administering Plans which *include* the Carriers. While the Carriers argue that we should not look at such "extrinsic" evidence on summary judgment, we are entitled to do so to the extent the Plans' terms are ambiguous. We see no reason not to look at it, given that the terms of the Agreements are undisputed, and we have rejected the Carriers somewhat belated argument that there are disputed factual issues relating to the validity or enforceability of the Agreements.[6]

For the foregoing reasons, we AFFIRM the judgment of the district court.

---

[6]The Carriers argue that the Star's treatment of one delivery agent amounts to conflicting extrinsic evidence rendering summary judgment improper. The Carriers assert that Floyd Weisner is a long-time delivery agent whom the Star treats as an employee and who receives ERISA benefits. The Star asserts that Mr. Weisner's situation has not been identical to that of the Carriers, in that he was employed both as a "hawker" employee, for which he was issued a W-2 form, as well as a delivery agent under an Agency Agreement, for which he was not issued a W-2. Even assuming that Mr. Weisner's situation was as described by the Carriers, that does not indicate that the Star's Plans were written to include all delivery agents/carriers, nor does it create such conflicting evidence as to make summary judgment improper.