Leo VARTANIAN, Plaintiff,

v.

MONSANTO COMPANY, et al., Defendants.

Civil Action No. 92–30223–MAP.

United States District Court, D. Massachusetts.

Feb. 20, 1997.

John C. Sikorski, John W. Lake, Robinson, Donovan, Madden & Barry, Springfield, MA, for Leo Vartanian.

Francis D. Dibble, Jr., Jerome M. Scully, Bulkley, Richardson & Gelinas, Springfield, MA, Richard J. Pautler, Richard P. Sher, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, MO, for Monsanto Company, The Monsanto Company Salaried Employee's Pension Plan (1986), The Monsanto Special Voluntary Retirement Incentive Plan for MCC and Corporate Staff Employees, The Employee Benefits Plans Committee of the Monsanto Company.

## *MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

(Docket No. 57)

PONSOR, District Judge.

### I. *INTRODUCTION.*

On March 27, 1990 plaintiff Leo Vartanian, a thirty-six year employee of the defendant Monsanto, notified his employer that he would be retiring in thirteen months, effective May 1, 1991. At that time he was the beneficiary of a pension plan adopted by Monsanto in 1986.

In the late winter and spring of 1990–91 Vartanian began to hear rumors about a new, more generous pension plan possibly under consideration by defendant. He made inquiry about these rumors to appropriate personnel at Monsanto. They told him that no new pension provisions applicable to him were under consideration. Relying on these comments plaintiff then left Monsanto as planned on May 1, 1991, receiving a lump sum in full payment of his pension entitlement.

Plaintiff subsequently learned that, following his departure, a new pension plan was in fact adopted. Under its terms he would have received a significant addition to his lump sum had he continued in Monsanto's employ until December 1, 1991. He now contends that he was the victim of misrepresentations

by Monsanto personnel, and that he would have remained employed for the additional seven months and received the additional payment but for these misrepresentations. Plaintiff has charged that Monsanto's conduct violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*

Defendants have moved for summary judgment, contending that the facts of record, distilled from extensive discovery, support only one material conclusion: Monsanto had *no* new pension plan applicable to the plaintiff under serious consideration at the time plaintiff made his inquiries, or indeed even at the time of his retirement on May 1, 1991. Because the court agrees that no factfinder could reasonably draw any other inference from this record, it will allow defendants' motion.

## II. *PROCEDURAL BACKGROUND.*

The complaint as originally filed on November 6, 1992 asserted claims in Counts I–III under ERISA and in Count IV under the common law. On December 15, 1992, Monsanto filed a motion to dismiss. On May 24, 1993 this court allowed the defendant's motion, holding that the common law claims were preempted by ERISA, and that plaintiff lacked standing to pursue his ERISA claims because he was not a participant in, or beneficiary of, the 1991 pension plan.

On February 2, 1994 the First Circuit affirmed that portion of the May 24 decision dismissing the plaintiff's common law claims, but reversed the part holding that plaintiff lacked standing to pursue claims under ERISA. Accepting the facts as pled, the Court of Appeals concluded that plaintiff was "within the 'zone of interests' ERISA was intended to protect." *Vartanian v. Monsanto Co.,* 14 F.3d 697, 702 (1st Cir.1994), citing *Astor v. International Business Machines Corp.,* 7 F.3d 533, 538–39 (6th Cir.1993).

Upon remand, this court dismissed Count II of plaintiff's complaint, which alleged that the defendants had violated ERISA by failing to disclose to plaintiff that they were considering a business restructuring. What remain now before the court are Count I, which claims that defendants violated ERISA

by failing to disclose that they were "seriously considering" a sweetened pension plan, and Count III, which charges that defendants violated ERISA by interfering with plaintiff's efforts to obtain benefits under the new plan.

In addressing the dispositive motions previously filed, this court as well as the First Circuit of course accepted the facts as pled in the complaint. In particular, the court assumed that plaintiff could prove that a new, more generous pension plan applicable to plaintiff, in fact, *was* under "serious consideration" at the time plaintiff made his inquiries before retirement. While conceding that this allegation would have to be accepted for purposes of the motions to dismiss, Monsanto's counsel has always made it clear that, if the case proceeded, defendants would vigorously contest this factual claim. Now, with the completion of discovery, defendants have argued that no material fact—nothing beyond plaintiff's ardent speculation—supports plaintiff's contention that any such "serious consideration" was underway at the relevant time. Defendants now contend that, to the contrary, the entire record (even viewed in the light most favorable to plaintiff) confirms that *no* serious consideration of any new plan applicable to the plaintiff occurred until after he left the defendant's employ. As noted above, because the court is compelled to agree, defendants' motion will be allowed.

## III. *SUMMARY JUDGMENT STANDARD.*

Fed.R.Civ.P. 56(c) permits summary judgment only if:

> ... the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The burden on the moving party under rule 56 is heavy. All facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in support of that party's position. *Stepanischen v. Merchants Despatch*

*Transp. Corp.,* 722 F.2d 922, 928 (1st Cir. 1983).

At the same time, the non-moving party also bears a significant weight—the obligation to "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e). These facts cannot be merely "conjectural or problematic." *Mack v. The Great Atlantic and Pacific Tea Company, Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

> [S]peculation and surmise, even when coupled with effervescent optimism that something definite will materialize further down the line, are impuissant in the face of a properly documented summary judgment motion.

*Roche v. John Hancock Mutual Life Ins. Co.,* 81 F.3d 249, 253 (1st Cir.1996).

The Supreme Court has described the reason for placing this obligation on the non-moving party succinctly:

> ... *there is no issue for trial* unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted) (emphasis supplied).

In assessing a motion for summary judgment, this court must place the facts of record against the Rule 56 grid. In other words, the court must determine if it is proper, and fair to the parties, to permit the case to move forward to trial. Obviously, it is unfair to a defendant to require it to defend allegations for which no possibility of adequate support exists. Less obviously, it is unfair to a plaintiff to perpetuate false hopes and generate expense, financial and otherwise, in a cause that is clearly doomed.

## IV. *FACTS VIEWED IN THE LIGHT MOST FAVORABLE TO PLAINTIFF.*

Plaintiff began working for Monsanto Company in June of 1954. By 1991 Monsanto had two operating units, known as the Monsanto Agriculture Company (MAC) and Monsanto Chemical Company (MCC). MCC itself had five operating divisions: Plastics, Resins, Fibers, Rubber and Detergents & Phosphates.

In 1991, plaintiff worked for MCC in the Plastics Division at its Indian Orchard facility. The Indian Orchard facility was also home to employees of the Resins Division, but Resins operated independently of Plastics.

Plaintiff was a participant in a pension plan known as The Monsanto Company Salaried Employees' Pension Plan, first offered in 1986 ("the 1986 Plan"). In May of 1989, plaintiff asked Monsanto to inform him of the amount of his potential lump sum benefit under the terms of the 1986 plan; on December 22, 1989, he informed Monsanto that he intended to retire as of January 1, 1991. Later, plaintiff changed his mind and stated that he intended to retire May 1, 1991, at which time he would be taking his benefits in a lump sum.

In the past, and as recently as the mid–80's, Monsanto had offered some employees a sweetened retirement deal in the form of early retirement or severance programs. Plaintiff learned that as of October 1990 MAC, not MCC, had offered enhanced pension benefits to some of its employees. In early 1991, he heard rumors that MCC might also be considering a more generous pension package.

Also in early 1991 MCC President Robert Potter began talking with Francis Reining, vice president of finance, and Robert Kaltenrider, a manager on Reining's staff, about ways to streamline MCC's operations in the face of projections of continued decreases in net income. These discussions focused on possibly discontinuing certain product lines or closing plants at several locations. None of the potential plant or product line closings involved the Plastics Division. No attempt was made by any of the three to draft, to discuss, or even to gather any information about, any new pension plan for MCC.

In March of 1991, following up on the rumors he had heard, plaintiff asked his immediate supervisor, Charles Eggert, whether there was any substance to the gossip about

some sort of more generous early retirement plan at MCC that might apply to him. Some time later, Eggert told plaintiff that he had looked into the rumors and that he had found nothing to suggest that MCC was considering an early retirement plan applicable to the plaintiff.

It is helpful to pause at this stage of the factual recitation and underline a very significant point. No evidence in the record, nothing beyond unsubstantiated speculation, supports any conclusion other than that Eggert was being completely truthful with plaintiff and, further, that Eggert's report reflected the reality at MCC at that time. No sweetened pension deal that could possibly have applied to plaintiff was even being investigated, let alone discussed—let alone "seriously discussed"—at MCC in the first four months of 1991. In fact, plaintiff makes no allegation that Eggert knowingly misled him.

Reassured by Eggert, on March 25, 1991, plaintiff and his wife signed an Affidavit, a General Release and an Agreement regarding the payment of plaintiff's pension benefits and his retirement.

At roughly the same time, MCC's Management Board, a group of approximately seventeen persons, began gathering information for MCC's annual long range plan. This Management Board met six times between April 21 and May 1, 1991. During these meetings the Board discussed the possibility of discontinuing or selling certain product lines. None of these was in the Plastic Division. More importantly, during these meetings *no discussions* took place regarding any possible new severance plan or early retirement scheme or anything of the kind. No one presented any analysis of the possibility. No draft document concerning any such possibility was prepared or distributed for comment.

In April 1991 plaintiff, having heard more rumors, again went to Eggert to ask about the possibility of an enhanced retirement program that might apply to him. He also asked Lori Heffelfinger, the personnel representative for the technology group at Indian Orchard. They both told him that they could uncover no substance to the rumors. Again,

plaintiff does not contest their truthfulness. Plaintiff then retired on May 1, 1991.

Following plaintiff's departure, MCC's top managers continued discussing the possibility of a restructuring at MCC, tentatively approving some degree of streamlining. On May 16, 1991 John Manns, Director of Employee Benefits, received for the first time the task of designing and developing an early retirement program to be offered *only* to MCC employees displaced by the closure of MCC plants or product lines. Counsel have stipulated that Manns had no forewarning of this assignment. In addition, of course, his work at this stage did not even cover the division where plaintiff had been employed, which was never considered for reduction or closure.

On May 16, 1991 Manns first contacted Monsanto's outside actuaries to begin gathering data necessary to develop a possible new, narrowly focused severance program. It has also been stipulated that these actuaries had no advance warning of their assignment and first learned of the request for data on May 16, 1991.

On May 21, 1991, Manns forwarded to the actuaries copies of a severance program previously offered by MCC to employees at its Columbia, Tennessee plant in August 1990 when that plant was closing, and two other severance plans dating back to 1987 (applying to a Missouri plant) and 1986 (applying to certain MCC staff units and its "Enviro-Chem" division).

In late May Manns began meeting with his supervisors and others to go over several possible options for some type of severance or early retirement program. Towards the end of the month Manns and others began discussing, for the first time, the possibility that some version of one of the alternatives might include an MCC-wide early retirement program. MCC's top management first endorsed the development of some kind of severance or early retirement program on June 3, 1991, but without specifics.

Each general manager of MCC's various divisions was now told he could decide whether the possible new severance plan would apply to his unit. In early June 1991 John

Tuley, vice president and general manager of the Plastics Division—plaintiff's old unit—decided that any proposed severance or early retirement program would *not* be offered to his employees, since they were not being directly affected by the restructuring. Tuley, however, soon asked to be relieved of his duties due to his wife's terminal illness, and his replacement, Arthur Fitzgerald, reversed Tuley's decision. The Plastics Division employees would now be permitted to participate in any new incentive retirement program, assuming one were adopted.

Various provisions of the plan were thereafter debated. The terms of the new plan were not finalized until June 27, and approved on June 28, 1991, for employees retiring on or after December 1, 1991. On average, the new plan cost Monsanto $65,735 for each employee who elected it. Significantly, by late-June, when it could be said that Monsanto did have a specific, MCC-wide, liberalized pension program under serious consideration, the defendants *did* inform employees who had made inquiries about its existence, and permitted them to take advantage of its benefits.

Against this array of facts plaintiff argues—not that even one witness can offer testimony that a specific plan actually was under "serious consideration" at a relevant time—but that, for various reasons, a factfinder could reasonably draw the inference that "serious consideration" of a more generous pension plan *must have been* underway at MCC before May 1, 1991.

In support of this inference plaintiff presents an eloquent and detailed description of the pressures on MCC and its president, Robert Potter, to increase the company's profits. Counsel highlights the problems caused by the end of the Gulf War and the company's disproportionately aging workforce. He points out that in the past Monsanto had used incentive programs to cover workers facing lay-offs resulting from reductions in force, skirting the undisputed fact that plaintiff's unit was never targeted for any such reduction. Top management's concededly substantial efforts at crafting a corporate restructuring in early 1991, plaintiff argues, *must* have included "serious consid-

eration" of some type of enhanced early retirement or pension program—or at least a factfinder could so find. A memo dated four days before plaintiff's retirement, after his inquiries were made, in which one of the Indian Orchard directors reports on the ages of his workers and their possible interest in an "early out program" constitutes evidence of serious consideration of such a program, in plaintiff's view. In the same vein, plaintiff points to the testimony of a former MCC employee who describes the atmosphere of uncertainty prevailing in the company in 1990 and 1991 as employees realized that a restructuring was being discussed.

This recitation does not, for the most part, specifically contest any of the facts set forth in defendant's Statement of Undisputed Facts. Where an attempt at disagreement is offered on a few points, plaintiff can only say that the issue should be left to trial but cannot point to inconsistent or rebutting facts actually in the record. This deficiency alone might require allowance of defendants' motion, under the terms of Fed.R.Civ.P. 56(e). Even if Rule 56 were not fatal to plaintiff's position, the law describing plaintiff's burden in these sorts of cases certainly is.

## V. *THE LEGAL STANDARD*

The First Circuit's holding prior to remand is clear.

> We hold that where an employee alleges a decision to retire based on alleged misrepresentations by his employer amounting to a breach of fiduciary duty, and the true facts are not available to the employee until after the employee has received all his vested benefits under a plan; and further, where the employee shows that in the absence of the employer's breach of fiduciary duty he would have been entitled to greater benefits than those which he received, then his receipt of payment cannot be used to deprive him of "participant" status and hence, standing to sue under ERISA.

14 F.3d 697, 703.

The heart of Judge Torruella's holding is the court's unwillingness to permit an em-

ployer to violate its fiduciary duty by making an affirmative misrepresentation, but keep an employee in the dark about this violation until after he has retired under a less advantageous pension plan. The nature of the exact fiduciary duty at issue is carefully specified in the court's decision. The employer has "a fiduciary duty not to mislead Vartanian as to the *prospective adoption of a plan under serious consideration.*" *Id.,* at 702, (emphasis supplied), *citing Berlin v. Mich. Bell Tel. Co.,* 858 F.2d 1154, 1163–64 (6th Cir.1988).

What does it mean for a new plan to be "under serious consideration?" It was not necessary for the First Circuit to address this issue directly, but this phrase has been construed most helpfully in the recent Third Circuit decision in *Fischer v. Philadelphia Elec. Co.,* 96 F.3d 1533 (3rd Cir.1996).

The court stated that "the concept of 'serious consideration' recognizes and moderates the tension between an employee's right to information and an employer's need to operate on a day-to-day basis." *Id.,* at 1539. On the one hand, businesses are constantly in the process of developing strategies; full disclosure of every nuance of this process is a "practical impossibility." *Id.* Moreover, an "avalanche of notices and disclosures" to employees would not materially assist their decision-making. *Id.* At the same time, a plan administrator may not make deliberate material misrepresentations.

To conciliate these concerns the Third Circuit described three factors to determine when a potential change in a benefit plan is under "serious consideration." When no such consideration is underway, a fiduciary violates no duty by failing to disclose internal deliberations or general evaluation of options.

> Serious consideration of a change in plan benefits exists when (1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change.

*Id.*

As to the first consideration, the *Fischer* court draws a distinction between serious consideration and the "antecedent steps of gathering information, developing strategies, and analyzing options." *Id.,* at 1540. A specific proposal must be sufficiently concrete to support explicit consideration. Turning to the second factor, the discussion becomes serious "when the subject turns to the practicalities of implementation." *Id.* While the third factor is not intended to mean that a corporate board with formal authority to authorize the plan must engage in its consideration, this criterion *does* require that the plan "be considered by those members of senior management with responsibility for the benefits area of the business, and who ultimately will make recommendations to the Board regarding benefits operations." *Id.*

The undisputed facts reveal that none of this occurred at Monsanto until weeks after plaintiff retired. Prior to May 1, 1991 no "specific proposal" existed. Indeed the "antecedent steps" of data gathering had not even begun. It was not until mid or late June that discussion of a plan could be said to have turned to "the practicalities of implementation," which was when authorized senior management were first taking a hard look at different forms of the potential new plan.

In reaching this conclusion the court does not intend to suggest that plaintiff is wrong to be disappointed or frustrated at the timing of defendant's decision-making. He missed the boat by only a few weeks. But, whenever a decision of this sort is made, there will be employees who fall close to the line. Unfortunately, the best that can be said of plaintiff's case, even taking all the facts in the light most favorable to him, is that this was a near miss. No plan was under "serious consideration" at the time of his retirement, and no fiduciary duty was violated.

This conclusion is obviously fatal to Count I, which makes reference to "serious consideration." It is no less fatal to Count III. No evidence remotely suggests that Monsanto took action to deprive the plaintiff of benefits. Indeed he concedes that the two people he spoke to directly were truthful to him. The undisputed facts demonstrate clearly that he suffered no discrimination and no actionable interference with the pursuit of his rights under ERISA.

In view of the discussion above, it is unnecessary to address the defendants' alternate argument that the plaintiff released all his claims by signing the Affidavit, General Release and Agreement on March 25, 1991.

## V. *CONCLUSION.*

For the foregoing reasons, defendants' Motion for Summary Judgment is hereby ALLOWED. The clerk is ordered to enter judgment for the defendants.