UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 97-1556

LEO VARTANIAN,

Plaintiff - Appellant,

v.

MONSANTO COMPANY, ET AL.,

Defendants - Appellees.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge] 



Before

Torruella, Chief Judge, 

Lynch, Circuit Judge, 

and Stearns,* District Judge. 



John C. Sikorski, with whom Robinson Donovan Madden & Barry, 
P.C. was on brief for appellant. 
Richard J. Pautler, with whom Peper, Martin, Jensen, Maichel 
and Hetlage, Francis D. Dibble, Jr. and Bulkley, Richardson and 
Gelinas were on brief for appellees. 



December 15, 1997


 

* Of the District of Massachusetts, sitting by designation.

STEARNS, District Judge. This appeal involves a STEARNS, District Judge. 

question of first impression in this circuit, namely, the

standard to apply in determining when an employer's consideration

of an employee severance program gives rise to a fiduciary duty

of disclosure under the Employee Retirement Income Security Act

of 1974, 29 U.S.C. 1001-1461 ("ERISA"). Plaintiff-Appellant

Leo Vartanian alleges that his former employer, Monsanto Chemical

Company ("Monsanto"), misled him by failing to respond adequately

to his inquiries about a severance package that was under

internal corporate consideration when he retired from the company

on May 1, 1991. A benefits package for which Vartanian would

have otherwise been eligible was approved by the Monsanto Board

of Directors on June 28, 1991.

Vartanian filed a complaint against Monsanto in 1992

alleging two counts of breach of fiduciary duty under ERISA, one

count of unlawful discrimination in violation of 510 of ERISA,

and one count of common law negligent misrepresentation. The

district court, Ponsor, J.,1 granted Monsanto's motion to dismiss

the action on the grounds that, having taken a lump sum

distribution of all the vested benefits to which he was entitled,

Vartanian could not qualify as a "plan participant" with standing

to assert ERISA violations. Vartanian v. Monsanto Co., 822 F. 

Supp. 36, 41 (D. Mass. 1993). This Court reversed, holding,

inter alia, that because Vartanian was a plan member at the time

 

1 Judge Ponsor was at the time a Magistrate Judge. He took
office as a District Judge on March 14, 1994.

-2-

the alleged misrepresentations were made, he had standing to sue

under ERISA. Vartanian v. Monsanto Co., 14 F.3d 697, 703 (1st 

Cir. 1994)(Vartanian I). 

On remand Judge Ponsor dismissed Vartanian's claim that

Monsanto had breached an ERISA duty by failing to disclose its

prospective plans to reduce staffing, but permitted the claims of

misrepresentation about the possibility of an early retirement

incentive plan to proceed. Vartanian v. Monsanto Co., 880 F. 

Supp. 63, 70-71 (D. Mass. 1995). After discovery, Judge Ponsor

granted Monsanto's motion for summary judgment, holding that

because no enhanced severance package that would have affected

Vartanian was under "serious consideration" at the time he

retired, no actionable misrepresentation had been made.

Vartanian v. Monsanto Co., 956 F. Supp. 61, 66 (D. Mass. 1997). 

We affirm.

I. I

Our review of a motion for summary judgment is de novo.

Associated Fisheries of Maine, Inc. v. Daley, F.3d , , 

No. 97-1327, 1997 WL 563584 at *3 (1st Cir. Sept. 16, 1997).

Summary judgment is appropriate where "the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law." Fed. R. Civ. P.

56(c). Inferences are drawn in the light most favorable to the

nonmoving party. Reich v. John Alden Life Ins. Co., 126 F.3d 1, 

-3-

6 (1st Cir. 1997). The nonmovant may not, of course, defeat a

motion for summary judgment on conjecture alone. "The mere

existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence

on which the jury could reasonably find for the plaintiff."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). 

The following undisputed material facts are drawn from

the parties' Joint Statement of Stipulated Facts, Defendant-

Appellee Monsanto's Statement of Undisputed Facts, and Plaintiff-

Appellant Vartanian's Response to Defendant's Statement of

Undisputed Facts. After thirty-six years at Monsanto, Vartanian

in December 1989 announced his intention to retire on January 1,

1991 (later amended to May 1, 1991). Vartanian was then employed

at Monsanto's plastics facility at Indian Orchard, Massachusetts.

Vartanian elected to take a lump sum distribution of his Salaried

Employee's Pension Plan benefits. During past restructurings of

its business, Monsanto had offered early retirement incentives,

sometimes on a company-wide basis and sometimes to specific

groups of employees.

During 1990 and 1991, Monsanto's sales stagnated and

net income shrunk. Rumors began circulating among Monsanto

employees that the company was pondering an early retirement

program as a cost-cutting device. These intensified when in

October of 1990 Monsanto Agricultural Company (a separate

Monsanto operating unit) offered a severance program to some of

its employees as part of a reorganization plan. In the first

-4-

quarter of 1991, Robert Potter, the president of Monsanto, began

discussing with his senior managers various proposals to

streamline operations at Monsanto Chemical. These included the

closing of several plants, but not the Indian Orchard facility

where Vartanian worked. No plans were drawn up to implement a

severance package,2 although Frank Reining, Monsanto's vice-

president of finance, prepared an estimate of the cost of

offering severance benefits to some 400 hypothetical employees.

In March of 1991, Vartanian asked Charles Eggert, his

immediate supervisor, if the rumors about an early retirement

plan were true. After investigating, Eggert reported to

Vartanian that Monsanto was not contemplating any severance

program for which he would be eligible. On March 25, 1991,

Vartanian and his wife executed an Affidavit, General Release,

and Agreement in anticipation of the release of the lump sum

benefits.

During the week of April 15-21, 1991, after gossip

about a possible severance plan revived, Vartanian contacted both

Eggert and Lori Heffelfinger, the personnel representative for

his employee group. Eggert and Heffelfinger told Vartanian that

they had been unable to confirm the rumors, and did not

personally believe that any early retirement package was in the

 

2 Vartanian asserts that any downsizing discussions would
inferentially have involved the issue of severance benefits
because of Monsanto's record of offering such incentives as part
of past restructuring. 

-5-

works. Vartanian does not dispute the truthfulness of either

statement.

Between April 21 and May 1, 1991, the Monsanto

Management Board met six times, eventually deciding to recommend

to the Board of Directors the closure of six plants. No

presentation concerning early retirement incentives was made at

any of these meetings, and no document analyzing or proposing a

severance program was prepared. Three alternate plans were drawn

up for restructuring Monsanto's multiple product lines. None of

the product lines in Vartanian's Plastics Division was

recommended for discontinuance. Vartanian retired on May 1,

1991.

On May 7, 1991, Potter met with the Monsanto Executive

Management Committee, which endorsed in principle his proposal to

restructure the company. On May 16, 1991, John Manns, the

director of employee benefits, was asked to develop a severance

program for potentially impacted employees. Manns asked

Monsanto's actuaries, Towers, Perrin, Forster & Crosby ("TPF&C"),

to gather the necessary data. On May 24, 1991, Manns gave TPF&C

an outline of his proposal. On May 28, 1991, Manns met with

Robert Abercrombie, the corporate benefits director, and Barry

Blitstein, a corporate vice president, to discuss a concrete

severance plan. It was at this meeting that the idea of

extending an offer of early retirement to all Monsanto employees

was first raised.

-6-

Coincidentally, on May 28, 1991, a St. Louis-based

Plastics Division employee who had decided to retire on June 1,

1991, was assured by letter that he would receive the value of

any increase in benefits if an early retirement program for which

he would otherwise have been eligible was adopted within three

months of his retirement date. On June 12, 1991, another St.

Louis-based Plastics Division employee who planned to retire on

July 1, 1991, was given a similar written assurance. Both

employees were eventually paid the additional benefits from

Monsanto's corporate treasury.

On June 3, 1991, Monsanto's Executive Management

Committee endorsed the idea of a company-wide early retirement

program, and authorized further development work on the project.

Potter told his division managers that they were to make the

final decision whether to offer the program to their respective

employees. John Tuley, the manager of Vartanian's division,

decided not to participate. Tuley's decision was reversed by his

successor, Arthur Fitzgerald, in mid-June of 1991. The

retirement plan was finalized on June 27, 1991, and approved by

Monsanto's Board of Directors on June 28, 1991. Had Vartanian

been eligible to participate, he would have received an

additional $174,700 in pension benefits.3

II. II.

Although this Court, in Vartanian I, stated that 

 

3 It is unclear whether Vartanian would have qualified for a
lump sum distribution had he chosen the early retirement option.

-7-

Monsanto had "a fiduciary duty not to mislead Vartanian as to the

prospective adoption of a plan under serious consideration," 14

F.3d at 702, it had no occasion to reach the question of what

exactly constitutes "serious consideration." The district court

on remand adopted the standard espoused by the Third Circuit in

Fischer v. Philadelphia Elec. Co., 96 F.3d 1533 (3d Cir. 

1996)(Fischer II), cert. denied, 117 S. Ct. 1247 (1997), that 

serious consideration obtains when "(1) a specific proposal (2)

is being discussed for purposes of implementation (3) by senior

management with the authority to implement the change." 956 F.

Supp. at 66 (quoting Fischer II, 96 F.3d at 1539). Finding that 

"[t]he undisputed facts reveal that none of this occurred at

Monsanto until weeks after plaintiff retired," 956 F. Supp. at

66, Judge Ponsor granted Monsanto's motion for summary judgment.

Id. at 67. 

Monsanto urges us to follow the lead of the district

court and adopt the Fischer II test. Vartanian asks for a more 

flexible standard loose enough to fit the facts of his case. For

reasons that will be explained, we prefer the Fischer II 

approach.4

 

4 We are aware that some courts of appeals have recognized the
possibility of an affirmative duty to advise a beneficiary of
potential plan changes, regardless of the existence of employee
inquiry. Antweiler v. American Elec. Power Serv. Corp., 3 F.3d 
986, 991 (7th Cir. 1993); Eddy v. Colonial Life Ins. Co., 919 
F.2d 747, 750 (D.C. Cir. 1990); but see Pocchia v. NYNEX, 81 F.3d 
275, 278 (2d Cir.), cert. denied, 117 S. Ct. 302 (1996)("[A] 
fiduciary is not required to voluntarily disclose changes in a
benefit plan before they are adopted."). This issue, however, is
not before us.

-8-

A. A.

It has been said that employers who offer benefit plans

wear "two hats," because of the "distinction between an

employer s prerogative to initiate discretionary policy decisions

such as creating, amending, or terminating a particular plan as

compared to its fiduciary responsibilities to administer an

existing plan for the benefit and interests of its participant-

employees." Drennan v. General Motors Corp., 977 F.2d 246, 251 

(6th Cir. 1992). When a prospective change in a benefit plan

will adversely impact some or all plan participants, tension

often arises between the employer s fiduciary obligations to its

employees and its institutional desire to keep its internal

deliberations confidential. This conflict is, in many respects,

an inherent feature of ERISA.5 As one district court has

observed, "[w]hen acting on behalf of the pension fund, there is

no doubt that [the employer] must act solely to benefit

participants and beneficiaries. However, . . . . the mere fact

that a company has named itself as pension plan administrator or

trustee does not restrict it from pursuing reasonable business

behavior . . . ." Sutton v. Weirton Steel Div. of Nat'l Steel 

Corp., 567 F. Supp. 1184, 1201 (N.D.W.Va.), aff'd, 724 F.2d 406 

 

5 The conflict has generated a fair amount of scholarly comment.
See Mary O. Jensen, Separating Business Decisions and Fiduciary 
Duty in ERISA Litigation?, 10 BYU J. Pub. L. 139 (1996); Steven 
Davi, To Tell the Truth: An Analysis of Fiduciary Disclosure 
Duties and Employee Standing to Assert Claims under ERISA, 10 St. 
John's J. Legal Comment. 625 (1995); Edward E. Bintz, Fiduciary 
Responsibility under ERISA: Is There Ever a Fiduciary Duty to 
Disclose?, 54 U. Pitt. L. Rev. 979 (1993). 

-9-

(4th Cir. 1983). We are called upon in this case to delineate

the point at which one form of reasonable employer behavior,

namely the confidential consideration of an employee severance

proposal, is overbalanced by the corresponding fiduciary duty

imposed by ERISA.

Early decisions grappling with the employer's duties in

this context focused mainly on the extent of the cause of action

engendered by an employer's material misrepresentations regarding

prospective changes in plan benefits. See Maez v. Mountain 

States Tel. & Tel., Inc., 54 F.3d 1488 (10th Cir. 1995); 

Vartanian I, 14 F.3d at 703; Fischer v. Philadelphia Elec. Co., 

994 F.2d 130 (3d Cir. 1993)(Fischer I); Berlin v. Michigan Bell 

Tel. Co., 858 F.2d 1154 (6th Cir. 1988). As a consensus on that 

issue developed, attention began to shift to the question of when

the consideration of a change in benefits reached a point of

seriousness sufficient to trigger a fiduciary duty of disclosure.

See Hockett v. Sun Co., Inc., 109 F.3d 1515, 1522-24 (10th Cir. 

1997); Muse v. I.B.M., 103 F.3d 490, 493-94 (6th Cir. 1996), 

cert. denied, 117 S. Ct. 1844 (1997); Fischer II, 96 F.3d at 

1538-41.

Vartanian urges us to reject the Fischer II test, 

ostensibly because it is too deferential to an employer's

corporate interests. Citing Varity Corp. v. Howe, 116 S. Ct. 

1065 (1996), Vartanian advocates a more diffuse test of when

corporate deliberations achieve the level of "serious

consideration." But he fails to suggest much by way of content

-10-

for his proposed test. It is true that Varity Corp. reaffirms 

the common law principle that a fiduciary must discharge its

duties "with respect to a plan solely in the interest of the

participants and beneficiaries." 116 S. Ct. at 1074 (quoting

ERISA 404(a), 29 U.S.C. 1104(a)). Varity Corp.'s relevance to 

the facts of this case, however, is questionable. In Varity 

Corp., the employer deliberately misled its employees about the 

actuarial soundness of a benefit plan to induce them to transfer

to a new division which had been tacitly created for the purpose

of consolidating the company's money losing ventures. Id. at 

1068-70. Because of the deception, the Court determined that it

"need not reach the question of whether ERISA fiduciaries have

any fiduciary duty to disclose truthful information on their own

initiative, or in response to employee inquiries." Id. at 1075. 

Vartanian proposes that, in the alternative, we adopt

the multiple factors test used by the Second Circuit to analyze

the materiality of an employer's misleading statements in Ballone 

v. Eastman Kodak Co., 109 F.3d 117, 125 (2d Cir. 1997). These 

factors include "[h]ow significantly [the false] statement

misrepresent[ed] the present status of internal deliberations

regarding future plan changes, the special relationship of trust

and confidence between a plan fiduciary and beneficiary, . . .

and the specificity of the assurance." Id. (citations omitted). 

Ballone, however, is also inapposite. Although the district 

court in Ballone, like the district court here, dismissed ERISA 

claims because of the lack of any evidence of "serious

-11-

consideration," 109 F.3d at 122, the complaint in Ballone 

alleged that the employer falsely informed the inquiring

plaintiff that the company had decided not to offer an early

retirement plan for at least two years. Id. at 121. It seems 

reasonable that where an allegation of positive misrepresentation

is involved, that "aspect of the assurance can render it material

regardless of whether future changes are under consideration at

the time the misstatement is made." Id. at 124. We are not here 

presented with facts that suggest a deliberate attempt on

Monsanto's part to affirmatively mislead Vartanian, and therefore

have no occasion to consider whether we would apply Ballone in an 

appropriate case.

It is true that in considering the scope of ERISA

fiduciary duties, we are counseled "to apply common-law trust

standards [while] 'bearing in mind the special nature and purpose

of employee benefit plans.'" Varity Corp., 116 S. Ct. at 1075 

(quoting H.R. Conf. Rep. No. 93-1280, at 302, 3 Legislative

History of the Employee Retirement Income Security Act of 1974 at

4569 (1976)). The common law impresses on a trustee the duty to

give a beneficiary "upon his request at reasonable times complete

and accurate information as to the nature and amount of the trust

property . . . ." Restatement (Second) of Trusts 173 (1957).

"[T]he beneficiary is always entitled to such information as is

reasonably necessary to enable him to enforce his rights under

the trust or to prevent or redress a breach of trust." Id. at 

cmt. c. Any application of trust principles in an ERISA context

-12-

must, however, as the Supreme Court cautioned in Varity Corp., be 

tempered by a scrupulous regard for the delicate balance Congress

struck in enacting ERISA.

[C]ourts may have to take account of
competing congressional purposes, such as
Congress' desire to offer employees enhanced
protection for their benefits, on the one
hand, and, on the other, its desire not to
create a system that is so complex that
administrative costs, or litigation expenses,
unduly discourage employers from offering . .
. benefit plans in the first place. 

Varity Corp., 116 S. Ct. at 1070. 

The Third Circuit, in our view, carefully reconciled

these competing concerns in shaping the Fischer II test.  

The concept of "serious consideration"
recognizes and moderates the tension between
an employee's right to information and an
employer's need to operate on a day-to-day
basis. Every business must develop
strategies, gather information, evaluate
options, and make decisions. Full disclosure
of each step in this process is a practical
impossibility. Moreover . . . large
corporations regularly review their benefit
packages as part of an on-going process of
cost-monitoring and personnel management. . .
. A corporation could not function if ERISA
required complete disclosure of every facet
of these on-going activities. . . .

Equally importantly, serious consideration
protects employees. Every employee has a
need for material information on which that
employee can rely in making employment
decisions. Too low a standard could result
in an avalanche of notices and disclosures. .
. . [T]ruly material information could easily
be missed if the flow of information was too
great. The warning that a change in benefits
was under serious consideration would become
meaningless if cried too often.

Fischer II, 96 F.3d at 1539. 

-13-

The Third Circuit concluded that "[s]erious

consideration of a change in plan benefits exists when (1) a

specific proposal (2) is being discussed for purposes of

implementation (3) by senior management with the authority to

implement that change." Id.6 Notably important to the Fischer 

II court was the effect that a less definite standard might have

on the availability of employee severance packages.

Finally, as a matter of policy, we note that
imposing liability too quickly for failure to
disclose a potential early retirement plan
could harm employees by deterring employers
from resorting to such plans. Our
formulation avoids forcing companies into
layoffs, the primary alternative to
retirement inducements. This further
protects the interests of workers.

Id. at 1541 (internal citations omitted). 

Those of our sister circuit courts that have addressed

the issue have generally followed the reasoning of Fischer II. 

The Tenth Circuit recently applied the Fisher II test in holding 

that "serious consideration" of a severance plan did not occur

until a meeting was convened that "gathered together the heads of

all departments related to employee benefits" to discuss a

specific proposal. Hockett, 109 F.3d at 1524. In Hockett, the 

Sun Company's vice president of human resources was contacted by

the plaintiff-employee regarding the possibility of an early

 

6 We add a gloss to the Fischer II court's formulation by way of 
clarification. To prevail under the Fischer II test, a plaintiff 
must show that a specific proposal under serious consideration
would have affected him. This we recognize is implicit in 
Fischer II and the rules governing ERISA standing, but to avoid 
any misunderstanding it is best said explicitly.

-14-

retirement program. Id. at 1519. The vice president did not 

respond to the employee's inquiry, despite the fact that he knew

that the subject was being discussed by senior management. Id. 

at 1521. Because of the employer's frequent need to review

retirement plans, the Hockett panel determined that the "Fischer 

II formulation appropriately narrows the range of instances in

which an employer must disclose, in response to employees'

inquiries, its tentative intentions regarding an ERISA plan."

Id. at 1523. 

Although the Sixth Circuit's opinion in Muse v. I.B.M. 

did not directly refer to Fischer II, it advocated a similar 

test, holding that "serious consideration" exists only when "a

company focuses on a particular plan for a particular purpose."

103 F.3d at 494. The Muse court was guided by what it found to 

be Congress's main object in imposing disclosure requirements on

ERISA fiduciaries, namely, to "ensure that 'employees [would

have] sufficient information and data to enable them to know

whether the plan was financially sound and being administered as

intended.'" Id. at 494 (alteration in original)(quoting H.R. 

Rep. No. 533, at 11 (1974), reprinted in 1974 U.S.C.C.A.N. 4639,

4649). Because an early disclosure requirement would "increase

the likelihood of confusion on the part of the beneficiaries

[and] . . . management would be unduly burdened by the continued

uncertainty of what to disclose and when to disclose it," the

court required the existence of a "particular plan for a

particular purpose." Id. It also found that "there [was] no 

-15-

convincing evidence that suggest[ed] that IBM studied the

possibility of enhanced benefit plans for any reason other than

to gain a general appreciation of its options." Id. 

As we have already indicated, our embrace of the

Fischer II approach is influenced by similar appreciation of the 

conflicting interests that ERISA seeks to reconcile. A primary

concern of Congress in enacting ERISA was not to discourage

employers from offering employee pensions. "We know that new

pension plans will not be adopted and that existing plans will

not be expanded and liberalized if the costs are made overly

burdensome, particularly for employers who generally foot most of

the bill." 120 Cong. Rec. 29,945 (1974)(statement of Senator

Long)(reprinted in Jensen, supra note 5, at 155-56). Equally 

important, the practical constraints of a severance program, and

the very purpose for which it is designed, counsel delaying

disclosure of a company's plans until a proposal becomes

sufficiently firm. "Changing circumstances, such as the need to

reduce labor costs, might require an employer to sweeten its

severance package, and an employer should not be forever deterred

from giving its employees a better deal merely because it did not

clearly indicate to a previous employee that a better deal might

one day be proposed." Swinney v. General Motors Corp., 46 F.3d 

512, 520 (6th Cir. 1995). Indeed, it is not implausible that

imposing a threshold lower than that of Fischer II would 

frustrate the very purposes for which a severance program

typically is designed: to reduce a workforce by voluntary means.

-16-

See Pocchia, 81 F.3d at 279 ("Employees simply would not leave if 

they were informed that improved benefits were planned if

workforce reductions were insufficient.").

At the same time, the fiduciary concerns underlying

ERISA are not to be ignored. "After all, ERISA's standards and

procedural protections partly reflect a congressional

determination that the common law of trusts did not offer

completely satisfactory protection." Varity Corp., 116 S. Ct. at 

1070. ERISA's primary goal is to "protect[] employee pensions

and other benefits by . . . setting forth certain general

fiduciary duties applicable to the management of both pension and

nonpension benefit plans." Id. The Fischer II court was 

therefore careful to emphasize that "this formulation does not

turn on any single factor; the determination is inherently fact-

specific. Likewise, the factors themselves are not isolated

criteria; the three interact and coalesce to form a composite

picture of serious consideration." Fischer II, 96 F.3d at 1539 

(citation omitted).

Thus, "[a] specific proposal can contain several

alternatives, and the plan as finally implemented may differ

somewhat from the proposal. What is required, consistent with

the overall test, is a specific proposal that is sufficiently

concrete to support consideration by senior management for the

purpose of implementation." Id. at 1540. Correspondingly, while 

"[c]onsideration by senior management is . . . limited to those

-17-

executives who possess the authority to implement the proposed

change," id., this prong 

should not limit serious consideration to
deliberations by a quorum of the Board of
Directors . . . . It is sufficient for this
factor that the plan be considered by those
members of senior management with
responsibility for the benefits area of the
business, and who ultimately will make
recommendations to the Board regarding
benefits operation.

Id. This emphasis on flexibility permits a trial court to apply 

the three-pronged standard without slighting the core fiduciary

principle that "[l]ying is inconsistent with the duty of loyalty

owed by all fiduciaries and codified in section 404(a)(1) of

ERISA." Varity Corp., 116 S. Ct. at 1074 (alteration in 

original) (quoting Peoria Union Stock Yards Co. Retirement Plan 

v. Penn Mut. Life Ins. Co., 698 F.2d 320, 326 (7th Cir. 1983)). 

Our primary reason for emphasizing the Fischer II 

test's flexibility is to remove any temptation that might exist

to deliberately evade one of its three factors as a means of

subverting ERISA's fiduciary commands. If it is clear from the

totality of the facts that a severance package is, in fact, under

serious consideration, we do not think that clever manipulation

of the Fischer II test should relieve a wrongdoer from ERISA 

liability. The ultimate question is whether "a composite picture

of serious consideration" has developed. Fischer II, 96 F.3d at 

1539. We recognize, of course, that this cautionary note is

directed to the exceptional case. Thus, in the typical case,

where there is no evidence of a deliberate attempt to circumvent

-18-

ERISA, a straightforward application of the Fischer II test is 

all that is required.

We thus conclude, modifying Fischer II, that serious 

consideration of a change in plan benefits exists when (1) a

specific proposal which would affect a person in the position of

the plaintiff (2) is being discussed for purposes of

implementation (3) by senior management with the authority to

implement that change.

B. B.

Turning to the facts of this case, it is clear that no

early retirement plan affecting Vartanian was under serious

consideration by Monsanto's senior management on April 21, 1991,

the day when Vartanian began his final inquiries. President

Potter had begun conferring with his senior managers about the

possibility of a corporate restructuring. He had asked for an

estimate of the cost that Monsanto would incur if 400 employees

were laid off. But these corporate ruminations, precipitated by

the downturn in Monsanto's business, did not trigger any

contemporaneous duty of disclosure.

First, there was no specific proposal under

consideration. At most, there was a suggestion that an enhanced

severance package might be one way to deal with the company's

fiscal woes. Second, although Potter was certainly among those

individuals qualifying as "senior management with the authority

to implement the change," there is no evidence that anything of

substance was, in fact, being discussed for implementation. The

-19-

ideas that were floating among top management were only that --

ideas. As a result, the answers that Vartanian received in March

and April of 1991, that no material changes affecting his benefit

plan were being considered, were not misrepresentations.

Potter received an endorsement on May 7, 1991, of his

restructuring proposal from the Monsanto Executive Management

Committee. Nine days later, he ordered the director of employee

benefits to begin planning a severance program for those

employees who would be displaced. Not until the May 28, 1991

meeting of senior managers was it proposed to extend the early

retirement plan to all Monsanto employees. This is the point at

which "the three [factors] interact[ed] and coalesce[d] to form a

composite picture of serious consideration," giving rise to a

fiduciary duty of disclosure. Fischer II, 96 F.3d at 1539.7 

Conclusion Conclusion

Vartanian's additional arguments on appeal are of no

merit.8 While we recognize that the outcome of this protracted
 

7 It appears that Monsanto went further than we might require.
After serious consideration had occurred, two employees who had
announced their intention to retire without inquiring about
possible changes in their retirement plans were retroactively
paid the value of the benefits enhancement.

8 Vartanian asserts error in the district court's grant of
summary judgment to Monsanto on his claim under 510 of ERISA,
which makes it unlawful for any person to discriminate against a
plan participant for purposes of interfering with any right under
a benefit plan. Vartanian's assertion, however, depends upon a
finding of a material misrepresentation.

He also suggests that, because a determination of "serious
consideration" is fact-specific, it can only be resolved by a
jury. At the summary judgment stage, however, only disputes of
material fact need be resolved by a fact-finder. Fed. R. Civ. P.

-20-

litigation is an unhappy one for Vartanian, benefit plan rules

and practices "inevitably hurt 'some individuals who find

themselves on the wrong side of the line.'" Palino, 664 F.2d at 

859 (quoting Rueda v. Seafarers Int'l Union, 576 F.2d 939, 942 

(1st Cir. 1978)). While it may be small comfort, Vartanian's

perseverance has resulted in the clarification of an important

area of ERISA law in this circuit.

For the foregoing reasons, the judgment of the district

court is affirmed. Costs to appellees. affirmed 

 

56(c).

Finally, Vartanian asserts error in the district court's grant
of a motion to strike his jury demand. Because we affirm the
district court's grant of summary judgment, we need not reach the
issue of Vartanian's failure to file a timely notice of appeal.
See Smith v. Barry, 502 U.S. 244, 248 (1992)(noncompliance is 
jurisdictional and fatal).

-21-