Max **MULLER**, et al., Plaintiffs,

v.

**AMERICAN MANAGEMENT ASSOCIATION INTERNATIONAL,**
Defendant.

**No. CIV.A.03–2225–CM.**

United States District Court,
D. Kansas.

Dec. 22, 2004.

John F. Edgar, Ralph K. Phalen, Edgar Law Firm, LLC, Kansas City, MO, for Plaintiffs.

Deborah P. Weisbein, Douglas R. Jensen, Eric J. Wallach, Michele Cerezo–Natal, Valerie K. Wilde, Kasowitz, Benson, Torres & Friedman LLP, New York City, Kirsten Ehlen Poppen, Attorney at Law, Springfield, MO, Timothy M. O'Brien, Shook, Hardy & Bacon L.L.P., Overland Park, KS, for Defendant.

### *MEMORANDUM AND ORDER*

MURGUIA, District Judge.

Plaintiffs bring this action against defendant pursuant to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*; and the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* Specifically, plaintiffs, as seminar presenters for defendant, allege they were improperly classified as independent contractors and thus denied benefits to which they were entitled under ERISA. Plaintiffs also claim defendant violated FLSA by denying them proper overtime compensation. This matter is before the court on defendant's Motion for Summary Judgment (Doc. 75) and plaintiffs' Motion for Class Certification (Doc. 69).

## I. Facts [1]

Prior to its sale in 2002, Padgett–Thompson's [2] primary activity was providing one and two day seminars on various business topics. The process of presenting these seminars was often referred to as "training." The customers attending defendant's seminar would receive written materials covering the relevant subject matter, as well as a one or two day oral presentation provided by the seminar leader. The persons who led seminars on behalf of defendant were called "trainers" or "presenters."

The trainers and presenter were retained in various fashions on an independent contractor basis, and entered into independent contractor agreements with defendant. While the form of the independent contractor agreements changed over the years, each of the agreements stipulated that the trainers would "act as an independent agent."

### A. Plaintiffs' Backgrounds

Each of the plaintiffs began their independent contractor relationships with defendant at different times. Tim Hardin first contracted with defendant in July 1983; lead plaintiff Max Muller began leading seminars in 1990, although he signed his initial independent contractor agreement with defendant in late 1989; and the other six plaintiffs began training for defendant between 1987 and 1995.

Max Muller was and is an attorney who received his law degree from the University of Kansas in 1973. Before he began presenting seminars for defendant, Muller worked as an attorney for approximately 16 years, including as corporate counsel for a publicly traded computer services business and in his own law practice.

Plaintiff Tim Hardin earned a PhD in 1974 from the University of Kansas in clinical psychology and then worked as an adjunct professor, as a private psychologist for private clients, and as a school psychologist for the Olathe School District.

Four of the plaintiffs had backgrounds in accounting. For instance, Lester Smith became a certified public account in 1976, two years after receiving his B.S. in business administration, and then applied that finance and tax expertise for approximately 18 years, including as an audit manager, controller, and vice president of finance, in addition to maintaining his own accounting practice. Richard Damron, after receiving a bachelor's degree in business administration, maintained his own accounting practice for approximately 20 years and also taught beginning and intermediate accounting courses as an adjunct professor in a local college. Martha Jenkins earned a B.A. in education, and then spent over 9 years working as an accountant, inventory controller and bookkeeper, in addition to starting and running her own corporation, which among other things provided accounting related consulting services. Sean Evans earned a B.A. in business administration, and then spent several years working in finance-related positions, including as an accountant, a director of finance and the chief financial officer for two different companies.

Don Hancock, after earning his B.A. in business administration, enjoyed a 17–year

---

**1.** The court construes the facts in the light most favorable to plaintiffs as the non-moving party pursuant to Fed.R.Civ.P. 56.

**2.** Padgett–Thompson was formed in or about 1977 under the name Path Management Industries, Inc. In 1985, Padgett–Thompson was purchased by H & R Block, Inc. and then in 1991, H & R Block sold the company's assets to defendant AMA. Padgett–Thompson continued in that status until AMA sold Padgett–Thompson in 2002. For purposes of this opinion, the court will hereafter refer to these entities collectively as "defendant."

career in television, radio and video before training for defendant. In addition to earning an Emmy award, Hancock became the president of his own video production company, and vice president and co-owner of a commercial radio station.

Dale Mask followed his B.A. degree with graduate work in physics, two years of teaching high school science, and a 15 year career in business, including as a business manager and as part owner and manager of his own business ventures.

With minor exceptions, each of the plaintiffs continued to present seminars for defendant from the time they signed their initial agreements until defendant was sold in 2002, a total of approximately 19 years for Tim Hardin, 15 years for Dale Mask, 13 years for Max Muller, 11 years for Martha Jenkins, 10 years for Don Hancock, 9 years for Lester Smith, and 7 years for Sean Evans and Richard Damron.

## B. Plaintiffs' Understanding of their Independent Contractor Status

At the point in time at the beginning of the working relationship between plaintiffs and defendant, plaintiffs were told that they would be treated as independent contractors. For example, Richard Damron "understood [his] relationship with defendant was going to be the relationship of an independent contractor." (Damron Dep. at 54). Sean Evans similarly recognized "that it was an independent contractor position." (Evans Dep. at 33). The other plaintiffs—Tim Hardin, Dale Mask, Lester Smith, Martha Jenkins, Max Muller and Don Hancock—had the same understanding. (Hardin Dep. at 101–02; Mask Depo. at 65; Smith Dep. at 127; Jenkins Dep. at 112; Muller Dep. at 101–02; Hancock Dep. at 80).

As independent contractors of defendant, plaintiffs understood they would not receive any employee benefits. Tim Hardin learned that trainers did not receive

benefits even before he ever spoke to defendant directly. Then, during his initial contact, Hardin asked about the possibility of receiving benefits, to which Bernie Edmond of defendant replied that defendant was not able to do that. Max Muller understood in early 1990 that "it was the policy of Padgett–Thompson not to provide employee benefits to trainers." (Muller Dep. at 113). Muller strongly disagreed with that policy, and he immediately voiced that disagreement to at least two defendant staff members, requesting that defendant provide him with benefits. The staff members declined his request, however, and stated that defendant did not provide such benefits to trainers.

Like Hardin and Muller, other plaintiffs also understood from the very beginning that their independent contractor relationships with defendant did not include the provision of employee benefits. Lester Smith, at the time he began presenting seminars in 1993, viewed himself as an independent contractor and understood that he "would not be receiving benefits." (Smith Dep. at 120, 130–131). Dale Mask understood, when he began presenting seminars in 1987, that he would be an independent contractor and that he would not receive health insurance benefits. (Mask Dep. at 70–71). Sean Evans understood "that there were no benefits ... provided to me by Padgett–Thompson." (Evans Dep. at 161–62). Richard Damron knew that his relationship with defendant would be that of an independent contractor and that his compensation would consist of only two items: his per seminar fees and his commissions on any product sales, and nothing beyond those two items. (Damron Dep. at 53–55). Martha Jenkins also understood when she began developing and later presenting seminars that she would receive no employee benefits. (Jenkins Dep. at 108–09). At the time of being hired, Don Hancock knew that he would

not be receiving benefits. (Hancock Dep. at 63, 89).

Several plaintiffs took steps to obtain their own health insurance when they began their association with defendant: Tim Hardin, within 30 days of commencing his association with defendant in 1983, purchased his own health insurance. Sean Evans, within the first couple of months after he began training for defendant in 1995, did the same. Max Muller, at the outset of his association with defendant in 1990, already had purchased his own health insurance, and he continued to maintain that insurance throughout the course of his association. Martha Jenkins, at the beginning of her association with defendant in 1992, was receiving health insurance through her husband, who happened to be an employee of defendant. After he ceased that employment in 1993, Jenkins and her husband purchased health insurance on their own. The other plaintiffs, Dale Mask, Lester Smith, Richard Damron, and Don Hancock, at the outset of their associations with defendant, received benefits like health insurance through their spouses' employment.

## C. The Independent Contractor Agreements Signed by Plaintiffs

Each of the plaintiffs, at the beginning of their relationship with defendant, signed a written agreement designating them as independent contractors. Although the form of agreement signed by certain plaintiffs differed from the form signed by others, each of those agreements provided that plaintiffs would "act as an independent agent."

For instance, Tim Hardin, Sean Evans, Dale Mask and Richard Damron each signed an agreement bearing the title "Contractor Agreement." That Contractor Agreement set forth in its very first paragraph the nature of the relationship between the parties, defining itself as an agreement between the company and the "Contractor." After certain recital paragraphs, the Contractor Agreement went on to spell out certain obligations of the parties to one another, including the provision that "[n]othing in this Agreement shall create, or be construed to create the relationship of employer and employee."

Lester Smith, when he began presenting seminars for defendant in 1993, signed a different form of agreement. This contract stated that defendant would pay Smith $400 for each day he presented the seminar, and to the extent he was unable to do so, he would receive no compensation whatsoever. It further provided that "the fees and expenses set forth herein are full compensation to you," saying nothing about employee benefits. Smith understood that this contract was consistent with his independent contractor relationship.

The remaining plaintiffs, Max Muller, Martha Jenkins and Don Hancock, began with defendant not as presenters of seminars, but rather as developers—persons who contracted with defendant for the development and presentation of a particular seminar or specified seminars. Each of these plaintiffs executed a contract (a "Development Contract" or a "Develop and Present Contract") in connection with that work, but again different plaintiffs signed different forms of agreements. While many of the Development and Develop and Present Contracts executed by Max Muller, Martha Jenkins and Don Hancock had different forms, they all described an independent contractor relationship.

On their personal tax returns, plaintiffs reported their income derived from defendant not as wages and salary, but as business income, filing a Schedule C for "Profit or Loss from Business." Two plaintiffs, Martha Jenkins and Don Hancock, had their seminar fees paid to the businesses

they owned, and reported that income on the business tax returns. Because the plaintiffs reported their seminar fees as business income, they were able to take deductions against that income.

### D. Federal and State Agency Classification of Plaintiffs

In 1988, following an Internal Revenue Service (IRS) audit, the IRS examined defendant's classification of its trainers as independent contractors. The IRS determined that defendant's classification was appropriate.

In March 2001, Keith Stubblefield, a former trainer of defendant,[3] filed a Form SS-8 with the IRS to request a determination of employment status for federal employment tax purposes. The IRS responded by letter (the Letter), stating that Stubblefield performed services in a manner consistent with an employer/employee relationship. The Letter also stated that the ruling was directed only to the individual taxpayer involved and that the ruling could not be used or cited as precedent. In addition, the author of the letter stated that, in reaching his determination, he chose not to consider defendant's defense under Section 503 of the 1978 Revenue Act. That section provides that, where an employer has a reasonable basis for treating workers as independent contractors, such as a past IRS audit or industry practice, the employer enjoyed a safe harbor from employment tax liability.[4] The letter concludes by stating that it does not constitute a notice of determination concerning a reclassification of workers.

With respect to state taxation, the State of Kansas determined in 1998 that certain individuals, i.e., presenters, were employ-ees rather than independent contractors. As such, defendant pays unemployment taxes to the State of Kansas. Plaintiffs contend that defendant never informed any trainer that it was paying unemployment taxes on their behalf or that the trainers were eligible for unemployment benefits, yet there is evidence in the record that at least one trainer applied for unemployment benefits and pursued hearings concerning that claim.

### II. Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that stan-

---

**3.** Keith Stubblefield is not a named plaintiff in this action.

**4.** The author of the Letter apparently chose not to consider Section 530 on the theory that it applied only to IRS examinations, such as an audit, and not an SS–8 application such as that made by Stubblefield.

dard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *see Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Discussion

### A. ERISA Claim

#### 1. Statute of Limitations

Plaintiffs assert that defendant mischaracterized them as independent contractors. Plaintiffs contend that they were, rather, employees, and therefore entitled to benefits under ERISA.

■ Because ERISA does not contain a statute of limitations for claims brought under Section 502, courts look to the statute of limitations for (a) the most analogous state law claim (b) in the state with the most significant relationship to the matter in dispute. *Held v. Mfrs. Hanover Leasing Corp.,* 912 F.2d 1197 (10th Cir. 1990). In this case, defendant contends, and plaintiffs do not dispute, that the applicable statute of limitations is five years. The court agrees. *Caldwell v. Life Ins. Co. of N. Am.,* 959 F.Supp. 1361, 1367 (D.Kan.1997) ("K.S.A. § 60–511 is the appropriate statute of limitations for ERISA claims brought pursuant to 29 U.S.C. § 1132."), citing *Columbian Fin. Corp. v. Businessmen's Assurance Co.,* 743 F.Supp. 772, 775 (D.Kan.1990) (because 29 U.S.C. § 1132 contains no statutory limitation period, courts generally have applied state statutes of limitations for actions upon written contracts), rev'd on other grounds, 956 F.2d 227 (11th Cir.1992).

■ Plaintiffs filed their claims in this case in May 2003. In order to survive the applicable five year statute of limitations, those claims must have accrued sometime within five years preceding the filing of the complaint. A claim under § 502(a)(1)(B) accrues "upon a clear repudiation by the plan that is known, or should be known, to the plaintiff-regardless of whether the plaintiff has filed a formal application for benefits." *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan,* 201 F.3d 44, 49 (2d Cir.1999).

■ Plaintiffs argue that their claims did not accrue until they had access to plan information, which they claim did not occur until 2003. However, the court concludes that plaintiffs' claims for ERISA benefits accrued when plaintiffs first learned they were not entitled to benefits by virtue of their independent contractor status. As stated in *Brennan v. Metropolitan Life Insurance Company,* 275 F.Supp.2d 406, 410 (S.D.N.Y.2003), "all of the district

courts that have considered claims made by individuals who were classified or treated as independent contractors have held that the statute of limitations begins to run when the beneficiary first learns that she is considered an independent contractor and is therefore not entitled to benefits, regardless of whether she later files a formal claim for benefits." (citations omitted).

Here, plaintiffs' own testimony establishes that each of them became aware at the very beginning of their association with defendant that they were working as independent contractors and would not be entitled to benefits. Indeed, the court believes that the statute of limitations began to run at the time plaintiffs signed their independent contractor agreements. *Id.; see also Schultz v. Texaco Inc.,* 127 F.Supp.2d 443, 448 (S.D.N.Y.2001) (finding that plaintiffs' claims accrued when they were taken off defendants' payrolls because they knew or should have known at that time that they were being reclassified as independent contractors and that their benefits were being repudiated); *Ambris v. Bank of N.Y.,* 1998 WL 702289, at *4–5 (S.D.N.Y.1998) (finding that plaintiff's cause of action accrued approximately six months after she began work because she understood at that time that she was considered a part-time employee and was therefore ineligible for benefits); *Berry v. Allstate Ins. Co.,* 252 F.Supp.2d 336, 343 (E.D.Tex.2003) (finding "the date of accrual would be at or near the date [plaintiffs] were hired because it is undisputed that they were informed from the beginning of their employment that they would not be able to participate in [defendant's] benefit plans"); *Kryzer v. BMC Profit Sharing Plan,* 2001 WL 1587177, at *4 (D.Minn. 2001) (finding that plaintiff knew, or should have known, when he signed the first independent contractor agreement that he would not receive benefits); *Bolduc v. Nat'l Semiconductor Corp.,* 35 F.Supp.2d 106, 120 (D.Me.1998) (finding plaintiff's claim for benefits accrued when he was first hired as a Facilities Engineer/Project Manager because he knew, at that point, "that he was being hired as an independent contractor and that, by virtue of this status, he would not receive employment benefits"); *Kienle v. Hunter Eng'g Co.,* 24 F.Supp.2d 1004, 1006–07 (E.D.Mo.1998) (finding plaintiff's claims accrued "when he signed the agreement clearly informing him that he would be considered an independent contractor and not an employee"). In the case of each named plaintiff, their discovery that they were not entitled to benefits occurred more that five years before the date the instant complaint was filed. As such, plaintiffs' ERISA claims are time-barred.

**2. Waiver**

■ The court has held that plaintiffs' claims are barred by the applicable statute of limitations. As an additional basis, the court further holds plaintiffs' ERISA claims are foreclosed by the Tenth Circuit's opinion in *Capital Cities/ABC, Inc. v. Ratcliff,* 141 F.3d 1405 (10th Cir.), cert. denied, 525 U.S. 873, 119 S.Ct. 173, 142 L.Ed.2d 141 (1998). *See also Boren v. Southwestern Bell Tel. Co.,* 933 F.2d 891 (10th Cir.1991) (rejecting a claim of employee status when plaintiff's contract specifically designated him as an "independent contractor" and further stated that he would not be considered an employee "for any purpose").

In *Capital Cities/ABC, Inc.,* the Kansas City Star sought a declaratory judgment seeking to prevent newspaper carriers from claiming any entitlement to ERISA benefits. *Id.* at 1408. The newspaper carriers had signed "Agency Agreements," a provision of which designated the carriers as "independent contractors" and not employees. The Agency Agreements also included the following specific preclusion to expectations of benefits: "It is further ex-

pressly understood that, as an independent contractor, The Agent will not receive, and has no claim to, any benefits or other compensation currently paid by The Star to its employees or hereafter declared by The Star for the benefit of its employees."

Relying on *Boren*, the Tenth Circuit held that the newspaper carriers, by way of contractual agreement, had knowingly agreed to be excluded as employees:

> Under the Agency Agreements, the Carriers and the Star mutually agreed that the Carriers would not be treated as employees, would not receive "any benefits or other compensation currently paid by The Star to its employees or hereafter declared by The Star for the benefit of its employees ...", and would receive as compensation only the fees set forth in the Agreements. ***Thus, it is clear under the Agreements—bilateral contracts entered into at the commencement of the working relationship—that the Carriers were not entitled to benefits under the Star's ERISA plans.***

In the case at hand, none of the plaintiffs signed contracts containing an explicit agreement to not receive benefits or to not pursue an ERISA claim. Significant to the court, however, is the rationale underlying *Capital Cities/ABC, Inc.'s* holding: "The relevant issue, under *Boren*, is whether the Agreements constitute a mutual understanding that the Carriers would not receive benefits.... In sum, while the Carriers' affidavits contain many statements suggesting that the Star did not in fact treat them as independent contractors, that is actually irrelevant to the narrow question at issue in this case—namely, whether the Carriers voluntarily agreed that they would receive no benefits under the Plans." *Id.* at 1410.

*Id.* (emphasis added). However, the Tenth Circuit pointed to the fact that the statement in the Agency Agreements-the explicit agreement not to receive benefits-was critical in its decision. *Id.* at 1409 n. 3.

Applying the rationale set forth in *Capital Cities/ABC, Inc.*, the court concludes in this case that plaintiffs and defendant in fact had reached a mutual understanding that plaintiffs would not receive benefits and that such an understanding continued throughout the course of their respective relationships, notwithstanding the fact that plaintiffs contend they were displeased with this situation. In sum, plaintiffs voluntarily agreed that they would receive no benefits. Accordingly, plaintiffs have waived their rights to proceed with an ERISA claim for benefits regardless of the fact that they may have been treated as employees. *See also Smith v. Torchmark Corp.*, 82 F.Supp.2d 1006, 1009–10 (W.D.Mo.1999) (granting summary judgment in favor of defendant, even though contract signed by plaintiffs contained no specific disavowal of the benefits sought, because plaintiffs had "signed agreements clearly stating that they were 'independent contractors' " and the plaintiffs' signatures "on those agreements showed that they understood what their intended status to be").

## B. FLSA Claim

Plaintiffs contend that, because they often worked more than forty hours per week for defendant, they are entitled to overtime compensation under FLSA. The requirements of FLSA apply only to employees. Assuming for purposes of this opinion that plaintiffs were treated as employees,[5] the court considers whether

---

5. The court questions whether plaintiffs were in fact treated as employees rather than independent contractors. However, the court views all reasonable factual inferences in favor of the nonmoving party.

plaintiffs fall within the professional exemption to FLSA's overtime requirements.

The FLSA requires employers to pay overtime to employees who work more than forty hours per week and are not specifically exempted. 29 U.S.C. § 207(a)(1). Employees performing in a "bona fide executive, administrative, or professional capacity" are exempt. *Id.* § 213(a)(1). The regulations implementing FLSA define the requirements for exemptions, and include a "long test" and a "short test." 29 C.F.R. § 541.3. It is uncontested in the instant case that plaintiffs' annual salary subjects them to the "short test," because they met the minimum salary requirement of $250 per week. *Id.* § 541.3(e).

■ Defendant argues that plaintiffs qualify as exempt professionals because, defendant claims, plaintiffs' work involved teaching for an educational establishment. The short test for this exemption requires a showing that the employee has as his primary duty "work that requir[es] the consistent exercise of discretion and judgment" and which consists of "[t]eaching, tutoring, instructing, or lecturing in the activity of imparting knowledge and who is employed and engaged in this activity as a teacher in the school system or educational establishment or institution by which he is employed." 29 C.F.R. § 541.3(a)(3), (b).

The court first addresses whether plaintiffs' duties as seminar instructors consisted of teaching on behalf of an educational establishment or institution. Plaintiffs do not dispute that, when defendant came under the ownership of AMA, it became a not-for-profit, "nonstock" corporation. AMA was incorporated by the Regents of the University of the State of New York as an "educational corporation." As reflected in its Certificate of Incorporation, AMA was formed solely for "educational and scientific purposes," including:

a. To advance the understanding of the principles, policies, practices and purposes of modern scientific and professional management and of the methods of creating and maintaining satisfactory relations in complex organizations...

b. To provide for the systematic collection, exchange and distribution of existing knowledge about the practice of scientific and professional management, and to ... conduct demonstrations, courses, programs and seminars, and issue publications designed to bring about, for the betterment of mankind, the application of the knowledge and skills discovered or developed through research...

The charter further provides that "the corporation hereby created shall be a nonstock corporation organized and operated exclusively for educational purposes, and no part of its earning or net income shall inure to the benefit of any individual."

Moreover, both Padgett–Thompson and AMA were approved as certified providers of continuing education. As such, while persons attending defendant's seminars did not receive degrees such as those awarded by universities, they did receive continuing education units that could be used to satisfy continuing education requirements imposed by their profession.

The court concludes that defendant was an educational institution within the meaning of FLSA. The court recognizes that defendant was not a school in the traditional sense. However, courts have found that institutions other than traditional schools or universities qualify as educational institutions. In *Gonzales v. New England Tractor Trailer Training School,* 932 F.Supp. 697 (D.Md.1996), for example, the court found that a "for-profit school for the education and training of persons desiring to engage in the operation of over-the-road tractor trailers and trucks" quali-

fied as an educational institution. In so finding, the court noted that the defendant corporation was accredited by a nationally recognized accrediting organization and that "there is no indication that an institution ceases to be a school simply because it is a for-profit organization." 932 F.Supp. at 702. Additionally, in *Wilks v. District of Columbia*, 721 F.Supp. 1383, 1386 (D.D.C.1989), the court found that an educational program maintained by a correctional facility "was essentially a school," in part because its teachers were certified and were "full-time professional educators." And while the program did not award any degrees, "the court does not find this factor fatal to a determination that the educational programs ... constitute an educational institution, or school." *Id.*

In the present case, although defendant did not award degrees, defendant awarded continuing education credits and, in order to do so, was authorized and approved as a provider of continuing education credits. Defendant, moreover, was chartered as an educational organization under the auspices of the State University of New York. Plaintiffs were, therefore, engaged as teachers in an educational establishment or institution[6]

■ The court now turns to whether plaintiffs' work required the consistent exercise of discretion. Plaintiffs contend that their work was completely controlled by defendant, in that plaintiffs had no control over their schedules, times, presentation sites, or the substance of their presentations.

It is undisputed that, prior to their association with defendant, some plaintiffs had experience in the workplace, yet none had worked as seminar leaders. As such, each plaintiff underwent a training period, during which they would learn defendant's substantive materials regarding the seminar they had agreed to present and defendant's policies and procedures with respect to their provision of services. The training period would typically conclude with a "dress rehearsal," where plaintiffs would present the entire seminar usually in front of at least one defendant employee, and sometimes in front of defendant's customers. Plaintiffs were assigned a training manager, an employee of defendant, who would serve as their contact with the company and who also worked with plaintiffs on how to do the seminars, flip-charts, and overheads. Subsequent to the training period, plaintiffs would go "on the road" and present the seminar for defendant's clients.

In presenting seminars, plaintiffs worked from a "leaders guide" prepared by defendant that addressed the subject matter of the seminar. Plaintiffs assert that the leaders guide was in essence a script which they were required to follow. Yet, in presenting the subject matter itself, defendant stressed to new trainers that it expected them to "make the seminars theirs." That is, each individual trainer was expected to inject their own personality into the material, to use examples or stories from their own experience, to incorporate current events or local developments into the presentation, and to develop a unique style of presentation.

Because defendant had provided its customers with a detailed brochure identifying the specific topics that the seminar

---

6. Considering the extensive education and experience of plaintiffs before working for defendant, and considering plaintiffs' use of that education and experience during the presentation of seminars, the court also believes that plaintiffs' work required advanced and spe- cialized knowledge, thus rendering them exempt from FSLA under 29 C.F.R. § 541(a)(1). The court need not, however, decide this issue on the merits because the court has determined that plaintiffs qualified as teachers under 29 C.F.R. § 541(a)(3).

would cover, the leaders guide would address those same topics which defendant expected plaintiffs to present. The brochures provided to customers additionally informed them of the starting and ending time for the seminars, and defendant also expected plaintiffs to adhere to those times.

With respect to the scheduling of seminars, plaintiffs would present defendant with dates they were available to work. Defendant would then send plaintiffs a seminar schedule, setting forth the days they were expected to work. During weeks in which the plaintiffs were not scheduled to present seminars, plaintiffs were free to pursue other business activities, so long as those activities did not conflict with the noncompete language in their contracts. Indeed, some plaintiffs had other businesses.

The court concludes as a matter of law that plaintiffs' work required the consistent exercise of discretion. First, plaintiffs controlled their own schedule, in that each would tell defendant which dates they were available, and defendant would then lineup seminars accordingly. Once the schedule was made, defendant expected trainers to adhere to those dates, times, and hours of the day that a plaintiff was presenting.

Most significantly the court looks to the discretion exercised during the actual seminar presentation. There is no question that plaintiffs were required to cover certain course material during each presentation. Yet, in a typical seminar, plaintiffs would have responsibility for such intangible but critical matters as sizing up the audience, determining the personality of a particular group, determining how to appeal to that personality, and very significantly, fielding questions from the group. Moreover, each plaintiff had been contracted by defendant based on their advanced knowledge and experience and, during the course of presenting seminars, plaintiffs unquestionably used that knowledge and experience.

In *Gonzales,* the court observed that the "teaching practices and requirements applicable to the instructor ... would appear to be rather clearly defined and carried into effect." 932 F.Supp. at 702. Notwithstanding that fact, the court found that the instructors still fell within the exemption because "while the teaching styles do seem to be fairly well regimented, they also appear to vary somewhat and to involve considerable use of discretion on the part of each instructor." *Id.* Here, as in *Gonzales,* while defendant unquestionably required certain practices and procedures for seminar presentation, plaintiffs' teaching styles just as unquestionably varied from one to another as a result of the discretion exercised by them.

Plaintiffs were, in the view of this court, teachers who were "professionals" within the meaning of 29 U.S.C. § 213(a)(1). For that reason, each plaintiff is exempt from the overtime provisions of the FLSA.

**IT IS THEREFORE ORDERED** that defendant's Motion for Summary Judgment (Doc. 75) is granted in its entirety. Plaintiffs' Motion for Class Certification (Doc. 69) is denied as moot. This case is hereby dismissed.